## CITY OF BENWOOD v. INTERSTATE BRIDGE CO.
### No. 1004.

District Court, N. D. West Virginia.
Jan. 24, 1940.

Robert J. Riley, of Wheeling, W. Va., for City of Benwood.

Charles McCamic and Frank W. Nesbitt, both of Wheeling, W. Va., for Interstate Bridge Co.

BAKER, District Judge.

This action was originally instituted as a mandamus proceeding in the Circuit Court of Marshall County, West Virginia. The defendant removed the same to this court, where it was docketed as a proceeding for mandamus upon the law docket at Wheeling. A motion was made to remand, which was overruled. A demurrer was then filed to the petition for mandamus, which was argued and briefed and, in turn, overruled. The defendant then filed its answer to the petition for mandamus, which answer also asserted a counter-claim. The plaintiff filed a motion to strike out that portion of the answer pertaining to the counter-claim, and also filed a reply thereto. The court then determin-

ed that an equity proceeding for mandatory injunction was the proper method to seek relief in this case, and the parties were directed to amend their pleadings to conform with the equity practice and the suit was transferred to the equity docket. A bill of complaint was filed, and an answer thereto again asserting the counter-claim was filed by the defendant.

Both counsel for the plaintiff and counsel for the defendant state in their briefs that a motion was made to strike the answer. Counsel, in this connection, are evidently referring to the motion to strike the answer to the petition for mandamus. No such motion appears in the record in regard to the answer in the equity suit.

This matter, however, was submitted to the court upon final hearing. Both parties were given an opportunity to introduce such evidence as they deemed proper and did introduce evidence, and the court viewed and inspected the bridge in controversy, the street, known as Eighth Street in the City of Benwood, thereunder, and that portion of what is now West Virginia Route No. 2, referred to as Marshall Street of Benwood and also as Kentucky Heights.

Apparently, both the plaintiff and defendant treat the matter as being now submitted for final decision upon the merits as well as upon the pleadings, and under the broad and liberal practice now obtaining by virtue of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the court feels that all the issues here presented should be now determined, irrespective of any possible questions of pure pleading.

The following facts were established by either admissions in the pleadings or by proof, and the court now finds them to be the pertinent facts in this action:

Sometime during the year 1921 or 1922 it was decided to construct a traffic toll bridge from the City of Benwood, West Virginia, to the City of Bellaire, Ohio. Two corporations were organized to accomplish this purpose. Both were named the Interstate Bridge Company, one being incorporated in the State of West Virginia and the other in the State of Ohio.

Upon November 14, 1922, the council of the City of Benwood adopted an ordinance, the pertinent portions of which are as follows:

"An ordinance granting to the Interstate Bridge Company, a corporation, its successors and assigns, for the period of fifty

years, the right to occupy certain streets and alleys for the purpose of constructing, maintaining and operating a vehicular and pedestrian traffic bridge and its approaches.

"Be it ordained by the Council of the City of Benwood:

"Sec. 1. It is hereby granted by the City of Benwood, insofar as it has authority so to do, to the Interstate Bridge Company, its successors and assigns, for the period of fifty (50) years, the right and privilege to construct, maintain and operate its vehicular and pedestrian traffic bridge and the approaches thereto on and over Eighth Street in the City of Benwood, extending from a point at or near the intersection of Marshall Street, with said Eighth Street, to the Ohio River, from which point said bridge is to be constructed over said river; with like right and permission to occupy with its approaches a portion of the west side of Marshall Street for a width of about eleven feet and a distance of about one hundred and fifty feet north of the present intersection of said Eighth Street and Marshall Street. This grant is only to the extent herein specified and is subject to the agreements, conditions and restrictions which are imposed and mentioned in the ordinance.

"Sec. 2. The minimum clearance of said elevated bridge over the present grade of Eighth Street shall be fifteen feet, with the right to construct into the Marshall Street approach at a less clearance. A clear distance of Thirty-eight (38) feet between curbs of Eighth Street shall be maintained, but the north curb line shall be moved south a distance of twenty-four (24) inches and all pedestals and columns shall be placed back of the curb line.

"Sec. 3. The right to construct, maintain and operate said bridge over Eighth Street, and its approaches is subject to the condition that said bridge company shall repave said Eighth Street with brick from the Ohio River to Ninth and Marshall Streets in a substantial manner, the same to have a concrete base of at least eight inches; said paving is to be completed as soon after acceptance of this ordinance as the construction of the bridge will permit, and shall be maintained during the life of this ordinance by the said bridge company. The City of Benwood further reserves the right to name the mode and methods of constructing said street.

"Sec. 4. It is further provided that the north railing of said bridge shall be solid from the west track of the Baltimore and Ohio Railroad to the east bank of the Ohio River. The floor shall be constructed of concrete or some other material such as will prevent the accumulation and blowing of dust and dirt. The said bridge company shall also build two stairways leading from the ground to the floor of said bridge, one of such stairways to be on the East side of McMechen Street, and the other on the west side of Main Street."

"Sec. 6. It is a further condition of this ordinance that by accepting the same the said Interstate Bridge Company agrees to pay to the City of Benwood the sum of Fifty Thousand Dollars ($50,000.00) which amount shall be paid as follows: Twenty Thousand dollars at the time of acceptance, and the remainder in three equal installments without interest, of Ten Thousand dollars each payable in four, eight and twelve months from the date of acceptance, respectively. Payment of said sum shall be independent of and in addition to all property tax that may be levied upon the said bridge by the City of Benwood."

On January 9, 1923, the Interstate Bridge Company, by action of its Board of Directors, formally accepted the provisions of this ordinance, which acceptance contained, in part, the following language: "Resolved further, said grantee, its successors and assigns, will comply with all the conditions and provisions of said ordinance, and said Company assumes upon itself the performance on its part of the conditions contained in said ordinance."

This acceptance was duly certified to the town council of Benwood, and was filed in the city records.

On August 27, 1925, the Interstate Bridge Company of West Virginia assigned all its rights under this ordinance to the Interstate Bridge Company of Ohio, the defendant in this proceeding, and the Interstate Bridge Company of Ohio accepted said assignment and notified the City of Benwood thereof. In the meantime, on March 18, 1924, the Congress of the United States passed a statute, 43 Stat. 27, in accordance with Title 33, Section 491, United States Code, 33 U.S.C.A. § 491, authorizing the construction of the bridge in question and, subsequently thereto, the Secretary of War and Chief of Engineers approved the plans and specifications, and the said bridge was actually built.

On December 23, 1926, the bridge was opened to traffic. The only means by which

vehicular traffic could enter or leave the bridge upon the West Virginia side of the river was the roadway or street known as Kentucky Heights. This street, at the time of the passage of the ordinance above referred to and for a long time prior thereto, had been in rather bad condition. It was apparently little more than a dirt road, badly pitted with holes, and not well suited to travel by motor vehicles. From the 15th day of January, 1927, to the 7th day of April, 1934, the bridge company made certain repairs to this road, consisting of dumping slag thereon and rolling the slag with steam rollers, and also expended some money, in conjunction with the County Court of Marshall County and the State Road Commission, in remedying a slip or slide which had developed under said road. A total amount of $10,529.13 was expended in this manner. Of this amount the sum of $7,672.11 was spent on repairing the surface of the road, and it is this expenditure that the defendant claims should be allowed as a counter-claim herein. The money expended in curing the slip or slide is not included in the counter-claim, and there is no contention that the City of Benwood is in any way liable therefor.

On or about April 3, 1928, the County Court of Marshall County and the State Road Commission formally took over the maintenance of the roadway on said Kentucky Heights.

The only really controverted question of fact in the case is whether or not this road, known as Kentucky Heights or Marshall Street, was a public street of the City of Benwood prior to 1928. Upon this question there is a dispute between the parties, the City claiming that this road was never a street of the City of Benwood and the Bridge Company claiming that it was at all times a street of the City of Benwood. This question, however, I do not feel has any bearing upon the ultimate decision in this case and, since it is possible that some future litigation might in fact turn upon this point, I expressly make no decision at this time as to the status of said roadway prior to the year 1928 or, for that matter, at any other time.

The city council of Benwood notified the Interstate Bridge Company that it should fulfill the conditions imposed by Section 3 of the above-mentioned ordinance by repaving Eighth Street in the City of Benwood with a concrete base, as provided in said ordinance, and should comply with Section 4 by making the north railing of said bridge solid from the west track of the Baltimore and Ohio Railroad to the east bank of the Ohio River. This the Bridge Company failed to do, and said street has still never been repaved, and said railing is still an open type, rather than solid, railing.

Twenty to twenty-five per cent of the traffic on Kentucky Heights uses the bridge.

■ (a) Should the Bridge Company be compelled to make the railing on the north side of the bridge, from the railroad tracks to the east bank of the Ohio River, solid?

The question of the railing is less difficult than that of repaving the street and will, therefore, be dealt with first.

The defendant takes the position that to make this railing solid would constitute a deviation from the plans and specifications of the bridge as the same had been approved by the Secretary of War and Chief of Engineers, and that, therefore, under federal law, the Company could not comply with Section 4 of the ordinance.

In passing, I may say that I do not believe that the slight change necessary to convert this railing from an open type into a solid rail, especially along a part of the bridge located entirely above the land rather than the river, would be such a deviation from the approved plans as to constitute a violation of federal law. It is a matter of common knowledge that all bridges over navigable streams are, of necessity, from time to time repaired, worn parts thereof replaced with new parts, etc. Every slight change of this nature might, under an extremely technical construction, be deemed a deviation from the approved plan. I do not, however, believe that this is the correct construction of the law, and feel that, in order to constitute a deviation, it must be a change actually affecting the position, strength or usefulness, of the bridge. In any event, in this case, counsel for the respective parties in oral argument virtually eliminated the question of the railing. Mr. Riley, counsel for the City of Benwood, stated, in part: "As far as the solid railing in the bridge is concerned, all the people in Benwood want them to do is to put sheet iron along the railing so that dust and dirt won't fall down on their houses and in their yards. That is all they ask." (See record, page 139.) And Mr. McCamic, one of counsel for the Bridge Company, stated: "So far as the piece of sheet iron is concerned, we haven't any

objection to doing that. Frankly, we had been asked to do .it. If it had not been coupled with the .demand to pave the street, it would have been done a long while ago." (See record, page 150.) Therefore, it appears that the Bridge Company is willing to fix this railing in a manner satisfactory to the City, and this feature of the case is eliminated. However, since the Company has not as yet actually fixed this railing, the final order herein should contain a mandatory injunction directing the Company to comply with Section 4 of the aforesaid ordinance by making the north railing of the bridge solid from the west track of the Baltimore and Ohio Railroad to the east bank of the Ohio River.

(b)  Paving of Marshall Street.

■  The Bridge Company asserts several principal defenses against the right of the City for a mandatory injunction to compel it to repave Eighth Street in the manner provided in Section 3 of the ordinance.

In the first place, the Company asserts that it has no funds with which to pay for this work, that, therefore, if the work is to be done, tolls upon the bridge will have to be increased, and that these tolls are established by the federal government and can only be changed with governmental consent. I think it is a sufficient answer to that contention to say that inability to pay has never been recognized as a defense in any court action. The question of whether or not the City can actually secure performance of a mandatory injunction is one which it will have to wrestle with when the same is issued. This is not a case in which the court is being asked to compel an act which is, of itself, physically impossible. The Company merely asserts that because of its present financial condition it is unable to do the paving in question. I, therefore, hold, as a matter of law, that the present financial condition of the Company is not a valid defense to the application for mandatory injunction.

■  Next, the Company takes the position that this bridge was constructed by virtue of an Act of Congress and not by virtue of the ordinance of the City of Benwood and, in argument,. in effect, seeks to completely nullify the ordinance as having no bearing upon this case at all. It seeks to adopt the legal position that this bridge could have been built in its present location and according to the plans actually followed without ever obtaining any consent what-

ever from the City of Benwood, the Company asserting that the Act of Congress gives it the right to construct the bridge and the approaches thereto in accordance with the plans approved by the Secretary of War, and that the City of Benwood would have been powerless to do anything about it. It was asserted in argument, and repeated in the brief for the Bridge Company, that the ordinance was only accepted, and at least partially complied with, in order to retain the good will of the citizens of Benwood.

Under the construction of law for which the Company contends, it would be possible for Congress, by authorizing a sufficient number of interstate bridges, to completely block and render useless every street in every city bordering· upon a navigable stream. The mere assertion of such a doctrine demonstrates its absurdity. However, in this case the point need not be judicially determined, because, irrespective of any obligation to obtain the consent of the City of Benwood, the Company did, in fact, obtain such consent in the form of an ordinance. The Company formally, by action of its Directors, accepted all the provisions of that ordinance and notified the City of such acceptance. It complied with at least certain provisions of said ordinance, in that it paid the City the $50,000, plus some interest upon deferred payments, provided for in Section 6 thereof. Under this set of facts, it seems to me immaterial whether the Company was originally compelled to obtain the consent of the City or not. It by corporate action accepted every provision of the ordinance in question, and it cannot now be heard to complain that the ordinance was not a necessary requirement for building this bridge. Even if the law should be as contended for by the Bridge Company, the fact that the Company was able to construct the bridge without litigating this right with the City, would, of itself, constitute ample consideration for the Company's promises to follow and live up to the conditions set forth in the ordinance. I, therefore, feel that this ground does not constitute·a legal defense against the petition for mandatory injunction.

■  The Company further asserts as a defense herein that the provisions of Section 3 of the ordinance constitute conditions subsequent rather than conditions precedent to the construction of the bridge,

that it, in effect constitutes a contract within a contract, separate and distinct from the balance of said ordinance, and that the only remedy available to the City is to seek monetary damages, the measure of which would be the cost of paving the street in the manner described in Section 3.

An analogy was sought to be drawn that this provision as to paving was in the same legal status as if the provision had been to construct a city hall, perhaps blocks away from the bridge in question, and that, therefore, all the City can do is to either pave the street itself and recover its reasonable costs expended in that connection, or to prove what the costs of such paving would be and recover that amount in money.

This position might have some merit if Section 3 provided merely for the repaving of Eighth Street. However, that section contains the words "and shall be maintained during the life of this ordinance by the said Bridge Company." The life of the ordinance is by its terms fifty years. Therefore, the obligation of the Bridge Company is not merely to repave the street with brick placed upon a concrete base, but is also to maintain such paving for a period of fifty years.

If the City were at this time awarded damages in a sum sufficient to pay for the paving of the street, it would then be compelled to collect from the Bridge Company, possibly by judicial proceeding, the cost of the upkeep of said street during all the time that the ordinance continues to run. Hence, it is apparent that monetary damages recovered now in an amount sufficient to pay for the paving of that street will not completely recompense the City. I, therefore, hold, as a matter of law, that this point does not constitute a defense to the application for mandatory injunction.

I now come to the most seriously contended, and perhaps most vexing, question in the case; that is, the right of the Bridge Company to offset against the cost of paving Eighth Street the seven thousand odd dollars that the Company spent to improve the surface of the roadway on Kentucky Heights.

From one standpoint, under the ruling made in regard to the defense last considered—that is, money damages as against specific performance of the contract—this question becomes moot. However, I feel that in justice to the parties hereto I should make my position clear on this phase of the case. It is not denied that any vehicular traffic entering or leaving the bridge at the West Virginia terminus thereof must travel over a section of what is now State Route No. 2, known as Kentucky Heights. This piece of road is approximately eight hundred feet long, and that portion of the bridge approach which was constructed by the Bridge Company entirely joins said Kentucky Heights at right angles; that is, traffic proceeding south upon State Route No. 2 must travel over some four hundred feet of this road and then turn right onto the bridge, and traffic proceeding north must travel over another stretch of the road of about equal distance and turn left onto the bridge. It is also established by the evidence for the Bridge Company—and, in fact, not denied by the City—that at the time the bridge was opened to traffic this section of road was in more or less bad condition, and that motor vehicles would have experienced some trouble in driving over the same in order to reach the bridge. It is also not denied that the Bridge Company expended its funds in excess of $7,000 in an attempt to improve the surface of this road in order to provide prospective patrons of the bridge with a smoother and more suitable means of reaching the same. The Bridge Company therefore contends that it was the duty of the City of Benwood to maintain this road in proper and suitable condition, that the City, having by ordinance consented to the construction of the bridge, was in duty bound to maintain the approaches thereto in a proper manner, that the City failed to do so, and that the Bridge Company thereupon performed a task which the City was under legal obligation to perform, and that under the doctrine of implied contract the Company would be entitled to recover this sum from the City and is, therefore, entitled to offset said sum against the cost of repaving Eighth Street.

A municipal corporation is actually in law a sort of dual personality. It has two separate and, in some respects, conflicting natures. In one aspect it is an arm of the government, and performs purely governmental functions; in another aspect it is a quasi private corporation, and may engage in business and realize profit therefrom, just as a private corporation would. The questions of what func-

tions of a municipal corporation are governmental and what are non-governmental is not always·an easy one, and there are many border-line cases which must be determined upon the exact facts involved. A convenient·rule of thumb which legal writers have sometimes adopted is that where a city is engaged in a matter in which the people of the entire state have an interest, that is a governmental function; but where a city is engaged in a project which only concerns its own citizens or, at best, a limited group of the citizens of the state, then it is acting in a quasi private capacity. See cases cited in 43 C.J. at page 70, et seq.

To take obvious examples of this,· the people of the entire state are interested in adequate police protection for a given city, since they may at any time be sojourners therein or travelers through its boundaries. Hence, the question of providing police protection is obviously a governmental one. On the other hand, where a city engages in a public utility business and furnishes water or electricity to its inhabitants, the only ones concerned are the direct consumers of these commodities, and the city in this respect is engaging in a quasi private enterprise and is bound by the laws governing private corporations.

█ The construction and maintenance of streets and alleys within the territorial limits of a city would seem to be a governmental function, and in the case of the City of Benwood I hold that, under the law, it is such.

█ It is true that under the laws of West Virginia a city has a duty to maintain its streets and alleys in a proper manner and in a condition suitable for the use to which they may be reasonably put. It is also true that the code of West Virginia gives a party injured by reason of disrepair of streets a right of action against the city for damages resulting therefrom (see West Virginia·Code, 8-4-10), but does this mean that any resident of the city who, however justly, feels that a portion of the streets thereof necessary to his business are not being properly maintained has the right to himself repair those streets and then recover the cost of such repair from the city government? I hold that no such right exists. The right to decide when a street needs repair and to determine the way in which repairs shall be effected resides exclusively in city council.

Let us take, for example, a merchant operating a store in the middle of a city block. Let us assume that the paving on this block, and perhaps for blocks around in every direction, is so rough that prospective customers will seek other places to deal rather than drive over the bad pavement to reach it. Would he have the right to himself determine that the city was not fulfilling its duty, to then himself decide how the streets should be built, to then himself actually build the street in accordance with his decision and then recover the cost of said building from the city? Under the law of West Virginia I hold that he would have no such right. What his remedy would be, I do not here have to pass upon, but I do say and decide, as a matter of law, that he could not construct what he thought was a proper street and then compel the city to pay him the money he had expended.

█ The Bridge Company is in exactly this position. It is true ·that the Bridge Company requested the city council to improve Kentucky Heights and that the city council failed to accede to this request, but that fact did not give the Bridge Company the right to do the work itself and then collect therefor. If it saw fit to do this work, it must bear the burden thereof.

█ Another fact in this connection in my mind militates against the Bridge Company's contention. The street known as Kentucky Heights, according to the evidence herein, was in no worse shape when the bridge was thrown open for traffic than it was in 1923 when the ordinance regarding the construction of the bridge was passed and accepted. This ordinance is a very complete document, comprising about two thousand words, and apparently was intended at the time of said adoption and acceptance to constitute the complete agreement between the City and the Bridge Company. The ordinance specified in detail just what rights the City was granting the Company, and just what obligations the Company had with respect to the City. If it had at that time been intended that Kentucky Heights should be repaved, why was not a provision to that effect incorporated in the ordinance?

I am also impressed by one fact in this case which .was proven by the defendant, and that is that only about twenty to twenty-five per cent of the traffic over Kentucky Heights used the bridge in question. The remaining seventy-five or eighty

per cent was through traffic bound north and south on the West Virginia side of the river. Apparently, this eighty per cent of traffic had been using this roadway, and the road was at least adequate to permit its use without resulting in claims for damage against the City. At least, the record is silent as to any such claims having been presented, and if any had I strongly suspect that the Company would have called my attention thereto. Therefore, in spite of the fact that, as pointed out above, this phase really presents a moot question, I hold, as a matter of law, that the Bridge Company would not under any circumstances be permitted to offset the money it expended in repairing Kentucky Heights against the cost of paving Eighth Street.

Counsel for the Bridge Company have cited numerous cases in which cities have been held liable upon the doctrine of implied contract or quasi contract for work performed or moneys expended in their behalf. Most of these cases deal with situations where the city was acting in a quasi private and not governmental capacity and are, therefore, not in point in the instant proceeding. Some few of them, as, for example, Cade v. City of Belington, 82 W.Va. 613, 96 S.E. 1053, involve the exercise of what might be considered governmental functions, but in the Cade case and in the others cited the city in question had contracted for or at least attempted to contract for the services involved, and recovery was sought to be denied because of some technicality in the manner in which the contract was executed, or in the manner in which funds to pay for the same would have to be secured. For example, in the Cade case, the city authorities actually engaged the plaintiff to act as a guard during a smallpox epidemic in order to prevent the spread of that disease. He had been engaged by city officials and, in fact, performed the services as they directed him. It was true that there was no express contract authorized by the city council and, in fact, the city council never formally directed Cade's employment, but under these conditions our court held that in spite of a technical breach of the city charter Cade was still entitled to his money. There is no evidence in the instant case that anyone even remotely connected with the City of Benwood ever told the Bridge Company to go ahead and fix up Kentucky Heights and that the City would stand the bill.

Practically all the other cases cited by counsel for the Bridge Company deal with non-governmental functions of a municipal corporation. As pointed out above, when the City acts in its quasi private, as opposed to its governmental, capacity, it is bound by the ordinary rules pertaining to corporations and, hence, these decisions are not in point here.

The Bridge Company also in argument brought out the fact that Eighth Street was not materially damaged by the construction of the bridge, that what slight encroachments had been made thereon have been repaired, and that the street is now in as good shape as it was before the bridge was built, with the exception of one block, and that this block was torn up by the City after the completion of the bridge. This contention cannot avail the Bridge Company in this case. Section 3 of the ordinance did not provide for a restoration of the street to its condition as of the date of the franchise. It did not contemplate merely that the Bridge Company would leave this street in the condition in which it had been prior to 1923. On the contrary, it specifically contemplated the taking up of the paving of Eighth Street, the placing of a concrete foundation thereunder, and the repaving upon said concrete.

Another contention made in argument was that Eighth Street was not to be repaved until the Bridge Company was in a financial position to do the work. A reading of Section 3 of the ordinance, wherein it says "Said paving is to be completed as soon after the acceptance of this ordinance as the *construction* of the bridge will permit," is a sufficient answer to this contention. The ordinance does not say that the work is to be done when the Bridge Company can conveniently do it. It says, in effect, it is to be done as soon as the bridge is completely built.

One more matter should be covered in this memorandum. Section 3 of the ordinance fixes the street to be repaved as "Eighth Street * * * from the Ohio River to Ninth and Marshall Streets." The phrase "Ohio River" is not an exact one. As every one who has lived upon the banks of that stream knows, the river line varies from time to time. If the government has ever in fact established a harbor line at Eighth Street in Benwood, the record is silent upon that point. However, I feel that it was conceded by both parties

that when the work is done upon Eighth Street only that portion thereof which was in fact paved at the date of the enactment of the ordinance is to be included in the new construction. One would be driven to this conclusion, irrespective of agreement, by reason of the use of the word "repave" rather than "pave." Therefore, the final order herein should provide for a mandatory injunction requiring the Bridge Company to forthwith repave, in accordance with the conditions of Section 3 of the ordinance, that portion of Eighth Street which was paved with brick upon the date the ordinance was adopted.

An order may be presented embodying the findings of this opinion.