**AMERICAN YEARBOOK COMPANY,**
Inc., Plaintiff,

v.

**Reubin O'D ASKEW et al., Defendants.**

Civ. No. 70-149.

United States District Court,
M. D. Florida,
Orlando Division.
March 10, 1972.

William B. Barnett, of Edward J. Hanlon, Jr. & Partners, Orlando, Fla., for plaintiff.

Robert L. Shevin, Atty. Gen., State of Fla., Stephen Marc Slepin, Counsel, Bd. of Ed., Tallahassee, Fla., for defendants.

Before DYER, Circuit Judge, and YOUNG and TJOFLAT, District Judges.

MEMORANDUM OPINION AND
FINAL JUDGMENT

TJOFLAT, District Judge:

This is an action brought by American Yearbook Company, Incorporated (American Yearbook), to challenge the constitutionality of certain Florida statutes and regulations which require that all public printing of the State of Flori-

da be done in Florida.[1] By statute, state printing is divided into two classes: Class A, all printing required by the Legislative Department of the State Government; and Class B, all printing required by the state not included in Class A.[2] Class B public printing jobs are subject to further control by the Department of General Services,[3] and, by regulation, it has designated, as Class B, printings for state-owned universities and colleges.[4]

American Yearbook is in the business of printing and manufacturing yearbooks for junior high schools, high schools, colleges and universities. It has agents in Florida who solicit contracts for the printing and manufacturing of yearbooks for various junior high schools, high schools, colleges and universities in Florida, both privately and state owned. However, because plaintiff has no printing facility in the state, it has been refused contracts to print yearbooks for state-owned universities.

American Yearbook attacks the constitutionality of the Florida printing statutes and regulations on three grounds. It complains that such statutes and regulations requiring that all printing be done within the state, first, place a burden on interstate commerce in violation of the Commerce Clause [5] and, second, deny it the equal protection of the laws guaranteed by the Fourteenth Amend-

ment. Plaintiff contends, finally, that the statutes grant the Department of General Services the power to determine what are Class B public printings, constituting a delegation of legislative power forbidden by the Florida Constitution.

Defendants, on the other hand, urge the validity of the printing statutes and regulations as a permissible exercise of the state's proprietary power which is exempt from the prohibitions of the Commerce and Equal Protection Clauses. As for the state-law question, they contend that the Department of General Services has no discretion to decide what may or may not be a Class B printing. Their arguments are well made.

*Improper Delegation*

The Court first considers the Florida constitutional question; for, if it can be answered in favor of American Yearbook, the federal constitutional questions can be avoided.

It is fundamental that the Legislature may not, except when authorized by the Constitution, delegate its legislative power, that is, the power to enact laws, or to declare what the law shall be or to exercise an unrestricted discretion in applying a law.[6] What plaintiff desires the Court to find is that the printings that make up the Class B category are

---

1. Section 283.03, Florida Statutes Annotated, provides: "All public printing of this state shall be done in the state, and the bond given by any contractor for such printing shall so state."

   Regulation #300–4.02(2), State of Florida Purchasing Manual, provides in part: "All printing required by any agency shall be manufactured in the State of Florida . . . ."

2. Section 283.04, Florida Statutes Annotated, provides:

   "All the public printing of the state shall be divided into two classes, class A, which shall embrace all printing required for the legislative department of the state government, and all of the printing required to be done for the supreme court, and class B, which shall embrace all of the printing required for the state not included in class A."

3. Section 283.10, Florida Statutes Annotated, provides in part:

   "No general contract shall be let to cover the printing designated as class B, but each job coming under this classification shall be let separately under regulations adopted by the state purchasing commission to the lowest responsible bidder who shall manufacture the same within the state."

4. Regulation #300–4.01, State of Florida Purchasing Manual.

5. Article I, Section 8, Clause 3, United States Constitution.

6. *See generally* 6 Fla.Jur. Constitutional Law § 147 (1956) and cases cited therein.

not adequately defined by the statute, leaving the Department of General Services unrestricted discretion to determine what they are and, thus, whether they must be done in Florida.

As we have indicated, the statute defines Class A printings as those required by the Legislative Department only; Class B includes "all of the printing required for the state not included in Class A." [7] It is further provided by statute that Class B jobs shall be let under regulations adopted by the Department of General Services "to the lowest responsible bidder who shall manufacture the same within the state." [8] Contrary to plaintiff's contention, the Legislature did not give the Department of General Services authority to designate what printing is Class B. The Department is only authorized to regulate the manner by which Class B contracts can be let.

■ The only non-federal question in this case must be resolved in the defendants' favor, and we are thus compelled to consider the federal constitutional questions.

### Equal Protection of the Laws

■ Governments in the United States traditionally possess two kinds of power: one, governmental or public, in the exercise of which it is a sovereign and governs its people; the other, proprietary or business, by means of which the government acts and contracts for the private advantage of its constituents and of the government itself.[9] Each of these types of power is limited by distinct sets of rules.[10] In order to protect the rights and freedoms of private citizens from oppressive interference, the power of a state to govern is restricted by its own constitution and provisions of the federal constitution as well. When the state exercises its proprietary or business power, however, it is subject to no more limitation than a private individual or corporation would be in transacting the same business. While the line between governmental and proprietary function is none too sharply drawn and is subject to modification as concepts of government are changed to meet the demands of society, one principle remains fixed: the letting of public contracts, particularly those providing for internal needs of government, is a proprietary function.[11] This principle is implicit in the Supreme Court's decision in Atkin v. Kansas.[12] In that case an attack was made on a Kansas statute which imposed criminal liability upon contractors with the state who permitted or forced an employee to work longer than eight hours per day. Atkin, charged with violating that statute, argued that he was denied equal protection of the laws because employers, not doing state work, were not so restricted. The Court discarded his equal protection argument in no uncertain terms:

> "Equally without any foundation upon which to rest is the proposition that the Kansas statute denied to the defendant or his employee the equal protection of the laws. The rule of conduct prescribed by it applies alike to

7, Fla.Stat.Ann. § 283.04. See note 2 supra.

8. Fla.Stat.Ann. § 283.10. See note 3 supra.

9. See generally Town of Graham v. Karpark Corp., 194 F.2d 616, 620–621 (4th Cir. 1952); City of High Point v. Duke Power Co., 120 F.2d 866 (4th Cir. 1941); Omaha Water Co. v. City of Omaha, 147 F. 1, 5 (8th Cir. 1906); Illinois Trust & Savings Bank v. Arkansas City, 76 F. 271, 282 (8th Cir. 1896); City of Benwood v. Interstate Bridge Co., 30 F.Supp. 952 (D.W.Va.1940).

10. See cases cited in note 9 supra. Since the cases cited herein involve questions of law different from the case at bar, the Court utilizes them merely to illustrate the point that governments may act in more than one capacity and thus subject themselves to different standards of conduct.

11. See generally cases cited in note 29 infra.

12. 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148 (1903). Atkin was followed in Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915).

all who contract to do work on behalf either of the state or of its municipal subdivisions, and alike to all employed to perform labor on such work." [13]

Significantly, the Court distinguished the statute in question from a similar statute which applies to employees in purely private work.[14] This illustrates the Court's cognizance of the difference between an exercise of a state's proprietary power, such as placing conditions on its own public contracts, and an exercise of governmental power, such as regulation of private industry by placing limitations on private contracts. The state's right to dictate the specifications for its own work is further affirmed by the Court's closing statement:

"We rest our decision upon the broad ground that the work being of a public character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done. Its action touching such a matter is final so long as it does not, by its regulations, infringe the personal rights of others; and that has not been done." [15]

American Yearbook argues that recent decisions of the Supreme Court have undermined the efficacy of *Atkin*. Two cases are cited to support this argument: Shapiro v. Thompson [16] and Graham v. Richardson.[17] We find them unpersuasive.

In *Shapiro* the Court reviewed constitutional challenges to state and District of Columbia statutes which denied welfare assistance to residents of the state or District who had not resided within their jurisdictions for at least one year immediately preceding their applications. The statutes in question created two classes of needy residents, indistin-

guishable except one was composed of people resident in the jurisdiction a year or more while the other comprised people resident less than a year. The Court overturned the statutes on two grounds: first, the classification constituted invidious discrimination against the second class of residents; secondly, it penalized the exercise of the constititional right to travel without promoting a compelling governmental interest.[18]

The *Graham* case involved constitutional challenge of two state welfare statutes. The question presented there was whether the Equal Protection Clause of the Fourteenth Amendment prevents a state from conditioning welfare benefits either (a) upon the beneficiary's possession of United States citizenship, or (b) if the beneficiary is an alien, upon his having resided in this country for a specified number of years. The statutes created two classes of needy persons, distinguishable only on the basis of citizenship. Recognizing that classification based on alienage, nationality or race is inherently suspect and subject to close judicial scrutiny, the Court held that the Equal Protection Clause had been violated.[19]

*Shapiro* and *Graham* are distinguishable from the case at bar in several meaningful ways. First, and most significantly, the former involved state and District of Columbia welfare statutes, not a state printing statute. The distribution of welfare benefits is obviously an exercise of governmental power. On the other hand, in framing specifications for its printing work, the state performs a proprietary function and stands in the shoes of a private party who is entitled in most instances to choose where and by whom his printing will be done. In that posture the state is like a trustee; the citizens are the beneficiaries. It may be necessary for

13. 191 U.S. at 224, 24 S.Ct. at 128.

14. *Id.* at 221–22, 24 S.Ct. at 126.

15. *Id.* at 224, 24 S.Ct. at 128.

16. 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

17. 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed. 2d 534 (1971).

18. 394 U.S. at 638, 89 S.Ct. 1322.

19. 403 U.S. at 376, 91 S.Ct. 1848.

the state to adopt discriminatory purchasing policies, such as those questioned here, to insure that the interest of the people is best served. In fact it is conceivable that the failure to do so would constitute a breach of the state's duty to its residents. In a case such as this, it is not for the Court to question the wisdom of the Legislature in discharging that trust obligation.[20]

The fact that *Shapiro* and *Graham* involved rights closely guarded by the courts offers a second ground on which those cases can be distinguished from the case at hand. The statutes scrutinized in *Shapiro* were found to have a chilling effect on the exercise of the fundamental right of travel implicity guaranteed to each citizen by the Constitution.[21] Hence, the Court applied to those statutes a test more strenuous than the typical "equal protection" test, stating that only the promotion of some *compelling governmental interest* by the statute would justify its enforcement.[22] In *Graham*, the fact that classification of welfare beneficiaries was based on alienage placed the statutes under inherent suspicion and subjected them to greater scrutiny than usual.[23] The Florida printing statutes and regulations are in no wise comparable, and, accordingly, we fail to see how the *Shapiro* and *Graham* decisions are applicable.

### Commerce Clause

American Yearbook next argues that, while *Atkin* upheld the state statute in the face of an equal protection argument, the Supreme Court has never considered the validity of such a statute under the Commerce Clause. It contends that the requirement that all state printing be done in Florida constitutes an undue burden on interstate commerce.

We first look to the Supreme Court for any pronouncement on this issue. In the language of the *Atkin* opinion we find implicit refutation of plaintiff's argument:

"[W]e can imagine *no possible ground*, to dispute the power of the state to declare that no one undertaking work *for it or for one of its municipal agencies* should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities."[24] (First emphasis added; other emphasis original.)

The Court dealt explicitly with the Commerce Clause question in Field v. Barber Asphalt Paving Company.[25] In

20. This principle was followed by the Supreme Court in Atkin v. Kansas, note 12, *supra*:
   "[I]t belongs to the state . . . to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such *considerations the courts have no concern.*" 191 U.S. at 223, 24 S.Ct. at 127.

21. While many of the Supreme Court's opinions speak in terms of the right of citizens to travel, the source of the right to travel has never been ascribed to any particular constitutional provision. *See* Shapiro v. Thompson, 394 U.S. at 630 n. 8, 89 S.Ct. 1322; United States v. Guest, 383 U.S. 745, 757–758, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

22. 394 U.S. at 638, 89 S.Ct. 1322.

23. 403 U.S. at 371–372, 91 S.Ct. 1848.

24. 191 U.S. at 222, 24 S.Ct. at 127.

25. 194 U.S. 618, 24 S.Ct. 784, 48 L.Ed. 1142 (1904).

that case the board of aldermen of Westport, Missouri, pursuant to a Missouri statute authorizing that body to provide for the city's paving, specified Trinidad Lake asphalt as the only asphalt to be used in a certain public paving project. Plaintiff, a paving contractor, argued that Trinidad Lake asphalt was a product of a foreign country, that there were suitable asphalt deposits available from other states, and that, under the circumstances, the specification was a burden on interstate commerce. The Court dispelled this contention:

> "In the present case it may be that the use of this kind of asphalt, under municipal authority conferred by the state will, in a limited degree, affect interstate commerce; but it certainly is not one of those direct interferences with the power over, and express control of, the subject given by the Constitution to Congress. In this day of multiplied means of intercourse between the states there is scarcely any contract which cannot, in a limited or remote degree, be said to affect interstate commerce. But it is only direct interferences with the freedom of such commerce that bring the case within the exclusive domain of Federal legislation." [26]

A federal case in point, not cited by the parties, is MacMillan Co. v. Johnson,[27] a 1920 District Court decision. There the Court considered a Michigan statute which dictated, among other things, the conditions under which a book dealer could sell text books to state school districts. Plaintiff, a text book publisher and dealer, alleged that the statute attempted to regulate interstate commerce by controlling the price of books shipped into Michigan in interstate commerce and was thus unconstitutional. The Court laid plaintiff's argument to rest in language no less pertinent here:

> "The foregoing considerations are applicable also to the contention of plaintiff that this statute is an illegal attempt to regulate interstate commerce. Plaintiff has no vested right, without the consent of the state, to sell and ship its books to the school officials of Michigan in interstate commerce. This situation is controlled, not by the question of place of residence or the law applicable to sales in interstate commerce, but depends on the old, familiar rule that a sale or contract cannot be made without the consent and agreement of both of the contracting parties." [28]

In addition to federal authorities, there are numerous state court cases holding legislation similar to the Florida printing statutes valid in the face of a Commerce Clause challenge.[29] Particularly worth noting is that three of these decisions upheld statutes which required that certain printing for the state or, in one instance, any county thereof, be done within the state or county.[30]

American Yearbook submits that more recent decisions by the United States Supreme Court have altered the holdings established by these earlier cases. Among others plaintiff cites Baldwin v. Seelig [31] and Polar Ice Cream & Creamery Co. v. Andrews.[32] State statutes

26. *Id.* at 623, 24 S.Ct. at 786.

27. 269 F. 28 (E.D.Mich.1920).

28. *Id.* at 31.

29. *See, e. g.,* Schrey v. Allison Steel Mfg. Co., 75 Ariz. 282, 255 P.2d 604 (1953); Denver v. Bossie, 83 Colo. 329, 266 P. 214 (1928); Ex parte Gemmill, 20 Idaho 732, 119 P. 298 (1911); State v. Senatobia Blank Book & Stationery Co., 115 Miss. 254, 76 So. 258 (1917); Pasche v. South St. Joseph Town-Site Co., 190 S.W. 30 (Mo.App.1916); Hersey v. Nelson, 47 Mont. 132, 131 P. 30 (1913); Knight v. Barnes, 7 N.D. 591, 75 N.W. 904 (1898).

30. State v. Senatobia Blank Book & Stationery Co., *supra*, note 29; Hersey v. Nelson, *supra*, note 29; Ex parte Gemmill, *supra*, note 29.

31. 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

32. 375 U.S 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964).

were struck down in these cases under the Commerce Clause because they reserved to resident milk producers a substantial share of the state's market, thereby burdening interstate commerce. What plaintiff fails to recognize is that those statutes regulated private industry. Trade regulations are clearly subject to Commerce Clause restrictions, but statutes that merely specify the conditions of state purchases are not.

Plaintiff also relies on the New Jersey Supreme Court case, Garden State Dairies of Vineland, Inc. v. Sills.[33] The statutes examined in *Sills* required any producer who sold milk to a state agency to certify that during the preceding year he purchased fresh milk produced in New Jersey in an amount at least equal to the amount being sold by him to the state agency. Additionally, he had to agree to purchase fresh milk produced in New Jersey in an amount at least equal to the amount sold by him to all New Jersey agencies during the current year. While the Court refused to declare the statutes *per se* violations of the Commerce Clause, it considered the restrictions on milk contracts a burden on interstate commerce, which, if unreasonable in fact, could render the statutes invalid.[34] The Court acknowledged that proprietary statutes imposing restraints had heretofore been presumed to place only reasonable and insubstantial burdens on interstate commerce. In view of the expanding proprietary activities of the states, however, it concluded that the existence of the presumption could no longer be supported.[35] We have not been cited to any other case which has adopted the conclusion reached by the New Jersey Supreme Court in the *Sills* case. The implications of that decision are troublesome and far reaching. To subject every job specification to an *ad hoc* measurement of its effect on interstate commerce would unduly interfere with state proprietary functions if not bring them to a standstill.[36] The *Sills* rationale will not be followed here.

For the reasons set out in this opinion, we hold that the Florida statutes and regulations in question do not violate the Fourteenth Amendment and Commerce Clause of the Constitution of the United States. Accordingly, it is ordered that the complaint be dismissed with prejudice and that judgment be entered for the defendants.

33. 46 N.J. 349, 217 A.2d 126 (N.J.1966).

34. *Id.* at 131.

35 *Id.* at 130.

36. One reviewer has described the troublesome implications of the *Sills* decision as follows:
"If statutes requiring the state to discriminate in its purchasing are void, administrative rulings or concerted buying practices accomplishing the same result should fall as well, since the means of discrimination employed can hardly be considered decisive. Yet this reasoning may suggest that there should be a cause of action on the part of a potential seller to oblige the state to do business with him; at least it may imply a right in an out-of-state seller to be considered on equal terms with domestic dealers and not to be discriminated against because of residence or source of supply. Accordingly, courts may be obliged to examine every questionable purchase by the state in order to assess the reasonableness of the grounds on which the state relies, or to probe the good faith of state officials in purporting to follow them; this woud be a particularly difficult task where complex questions of commercial conduct are raised." Recent case, 80 Harv.L.Rev. 1357, 1360–61.