OPINION OF THE COURT
Fuchsberg, J.
We hold that section 222 of the Labor Law, which mandates preferential employment of New York citizens on public works projects, offends the privileges and immunities clause of section 2 of article IV of the United States Constitution.[1]
In broad and unqualified terms, section 222 commands that, in the construction of public works, the State, its subdivisions and the contractors they, employ must give "preference in employment * * * to citizens of the state of New York who have been residents of the state for at least twelve consecutive *519 months immediately prior to the commencement of their new employment”. The statute comes before us in the following factual and procedural context:
Plaintiffs David S. Salla and Robert W. Keppley, residents of Pennsylvania, are employed as equipment operators by Lisbon Contractors, Inc., a Pennsylvania corporation engaging almost exclusively in the installation of public sanitary sewers. One of the largest firms in its highly specialized industry, Lisbon carries on its activities throughout the east coast, about 40% of its work being done away from its home State. It maintains a permanent crew of employees whose experience, ranging in duration in individual cases from between 3 to 16 years, averages 6 years overall. For many employees the wide-ranging location of Lisbon’s job sites has made it necessary for them to shift from one temporary abode to another as Lisbon’s projects move them from State to State.
Lisbon was awarded a contract to construct a sanitary sewer line for Monroe County and its Division of Pure Waters. Seventy-five percent of the project’s funding came from Federal moneys allocated to implementation of the Environmental Protection and Pure Water Acts of the United States. Salla and Keppley, who were assigned to the Monroe project, immediately entered into a one-year lease for local living quarters. Soon thereafter, their employment terminated because Lisbon found it necessary to accede to the county’s insistence on strict enforcement of section 222, which had been incorporated as a term of the contract. The individual employees have alleged that, because of job scheduling conflicts, they would find themselves without work for a period of four to five months.
 Salla and Keppley, together with Lisbon, then brought this action, in which they sought a declaration that section 222 is unconstitutional and an injunction against its enforcement.[2] Pursuant to CPLR 1012 (subd [b]), the Attorney-General intervened on behalf of the State in support of the statute’s constitutionality. There being no dispute as to the essential facts, on a motion for summary judgment, Special *520 Term, finding support for its determination not only in section 2 of article IV but in both the Federal Constitution’s commerce clause and its Fourteenth Amendment’s equal protection clause as well, granted the requested relief. In turn, the Appellate Division, premising its own conclusion on the privileges and immunities and commerce clauses alone, affirmed (64 AD2d 437). For the ensuing reasons, we uphold its determination, but we find it unnecessary to go beyond the privileges and immunities clause.
Since the circumstances surrounding the adoption of the constitutional clause in question will help clarify the scope of the protection it was intended to afford, we start our analysis with a brief review of its history. Section 2 of article IV was born of more than the founding fathers’ commitment to the creation of a Nation that recognized the universality of "natural rights”.[3] By its adoption, the architects of the Constitution also sought to deal with a more specific and immediate problem. For, once the unifying influence of the British Crown had been swept away by the Revolution, strong strains of separatism had emerged among the former colonies. Threatened with the prospect that the treasured independence each of the individual States had now achieved might lead them to adopt highly protectionist economic policies, careful provision to avoid such an eventuality was made as early as in the drafting of the Articles of the Confederation: "The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this union, the free inhabitants of each of these states * * * shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each state shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions, as the inhabitants thereof respectively”. (9 Journal of the Continental Congress. [Govt Printing Office, 1906], pp 908, 909.)
The importance ascribed to the right to travel and to pursue a livelihood or to otherwise engage in trade and commerce is seen from the juxtaposition of these rights with the "privileges and immunities of free citizens”. For "privileges and immunities of free citizens” embraced no less than those "natural rights” thought to inhere in the very concept of *521 civilized government, such as the right to "enjoyment of life and liberty” and the pursuit of "happiness and safety”, the denial of which by any of the States would have been unthinkable to the revolutionary theoreticians (Blake v McClung, 172 US 239, 248-249; see, generally, Antieau, Modern Constitutional Law [1969 ed], §§ 9:13, 9:14).
It is a measure of the unanimity that prevailed on this subject that Alexander Hamilton dubbed it the very "basis of the Union” (The Federalist No. 80). So, when the Constitution itself was penned, unlike those provisions whose detail reflects the controversy and compromise that preceded their adoption, the privileges and immunities clause was set out in broad, concise and unqualified terms. (See, generally, 3 Farr and, Records of the Federal Convention of 1787 [1911 ed], at p 112; 5 Elliot’s Debates on Adoption of Federal Constitution [2d ed, 1836], at p 487; Madison, The Federalist No. 42). Ironically, it was this lack of specificity that later would make it possible for courts to be persuaded, on a seemingly ad hoc basis, to introduce exceptions to the clause’s literal application.
For example, it was held not to interdict a State’s conditioning of the right of a nonresident to bring suit on the posting of security for court costs (see Blake v McClung, 172 US 239, 256-257, supra), its exclusion of noncitizens from access to State-owned oyster beds (Corfield v Coryell, 6 Fed Cas 546), or its requirement that any employee of a nonresident business be deemed an agent for the receipt of process (Doherty & Co. v Goodman, 294 US 623). But the clause was applied to strike down statutes under which out-of-State merchants alone were required to take out licenses (Ward v Maryland, 12 Wall [79 US] 418), under which citizen creditors were given a preference over nonresidents in the distribution of assets of local insolvent businesses (Blake v McClung, supra), under which property of noncitizens was taxed at a higher rate or in a different manner than that of citizens (Matter of Stanford, 126 Cal 112) and under which barbers’ licenses were restricted to residents (Templar v State Bd. of Examiners of Barbers, 131 Mich 254).
In all, these cases evidence an approach under which courts, while giving obeisance to the immunity clause’s broad-ranging proscription against disabilities when they were based on alienage per se, would allow disparate treatment of a noncitizen when the particular circumstances which brought him into the State were, in the exercise of what has been charac *522 terized as a largely standardless judicial judgment, deemed sufficient to make differentiation "reasonable” (see Tribe, American Constitutional Law, § 6-32, pp 407-408).
However, the time came when the Supreme Court, obviously less than happy with this unstructured and unpredictable method for determining the availability of a constitutional principle on which the unity of the citizens of the Nation in large part rested, substituted a more sophisticated measure that balanced the national interest in access to local resources against the local interest in developing homegrown cures for indigenous evils (Toomer v Witsell, 334 US 385). Toomer involved a South Carolina statute which discriminated against nonresident commercial shrimp fishermen by imposing a license fee 100 times greater than that charged residents. In declaring that statute invalid, the court did not revert to the absolute language of the clause itself, but, emphasizing that each State had to accord substantial equality of treatment to the citizens of the others, went on to formulate the more precise test that prevails to this day.
The test is twofold. When a right protected by section 2 of article IV is infringed, a court must first determine whether "perfectly valid independent reasons” for the disparity of treatment exist. But that is not enough. It must also decide whether, quantitatively or qualitatively, the degree of discrimination bears a truly "close relation” to the reasons assigned (334 US, at p 396). Since there was nothing in tbe record in Toomer to indicate that nonresident fishermen were a "peculiar source” (at p 398) of the danger of overfishing, the evil which the State claimed it was combatting, the statute was found to be unconstitutional. In the wake of this decision has come renewed appreciation of the breadth of the protections afforded by the privileges and immunities clause (see, e.g., Doe v Bolton, 410 US 179 [access to medical services cannot be limited to State residents]; Matter of Gordon, 48 NY2d 266 [bar examination residency requirements unconstitutional]).
In now applying the Toomer test, we observe, initially, that the interests of Salla and Keppley are within the purview of section 2 of article IV. From the very beginning, it has been clear that the right to ply one’s trade in any State in the Nation was at the heart of the clause’s guarantees. Indeed, the Supreme Court only recently re-emphasized this point in a privileges and immunities context by contrasting the fundamental nature of the right of a citizen to earn a living in a *523 State other than his own with the less essential nature of such a pursuit of recreational activity (see Baldwin v Montana Fish & Game Comm., 436 US 371). Moreover, shortly thereafter, in passing on an Alaska statute substantially similar to section 222, the same court, in an approving elaboration of Toomer, reiterated the basic tenet that "a resident of one State is constitutionally entitled to travel to another State for purposes of employment free from discriminatory restrictions in favor of state residents imposed by the other State” (Hicklin v Orbeck, 437 US 518, 525, noted in 12 Akron L Rev 346).
Conscious of the importance of the interest at stake, we turn to the nature of the "independent reason” on which the State and county urge that the statute does not run afoul of the constitutional bar. As did the State of Alaska in Hicklin, they insist that a high rate of unemployment in the State justifies the preferring of New York residents for public works jobs. Granted that the counteracting of unemployment is a legitimate State concern, the relevant criteria for privileges and immunities analysis still are whether nonresidents are a "peculiar source” of the evil of joblessness in New York and whether the statute is fashioned with sufficient precision to meet the problem without unduly impinging on the rights of those who do not contribute to it. In the end, nothing less than a unique link between the interest served and the discrimination practiced will do. (See, generally, The Supreme Court, 1977 Term, 92 Harv L Rev 57, 75-86.)
Far from any demonstration of a close relationship between nonresident employment on public works projects and unemployment rolls, there is nothing in this record to connect the two at all. In fact, there is nothing to indicate that an influx of nonresidents for any purpose is a major cause of our unemployment. Furthermore, though, simplistically viewed, it of course can be said that every position filled by a Pennsylvania resident is one less job for a New Yorker, the statute does not in fact prefer the unemployed over the employed as replacements for dislocated nonresidents. For all that it provides, qualified residents may be drawn away from ongoing employments in order to accept what they may regard as the more attractive opportunities thus created, an inconsistency given considerable weight in Hicklin (supra, at pp 527-528).
Nor is section 222 geared to focus efficiently on its goal. Instead, with blunderbuss overbreadth, it makes no distinction between supervisory and nonsupervisory employees, giving no *524 consideration at all to the much smaller universe of jobs or of suitable replacements that are in the offing at that level. And, it goes without saying that, even if the New York pool of workers includes persons with qualifications for the openings the statute forces, a project is likely to be completed more quickly, more efficiently and more economically under supervisors who enjoy an employer’s confidence and who are familiar with its practices. Nor is it to be assumed that the readier co-ordination between experienced supervisors and a team of tried employees who customarily work together is inconsequential. Such factors may readily give rise to a situation in which the disadvantages of additional expense, inconvenience and organizational disruption are sufficient to deter contractors from bidding on New York public works jobs altogether. The consequences hardly "secure [the] community of intercourse” among the States that is the raison d’etre of the privileges and immunities clause (Lemmon v People, 20 NY 562, 607).
The defendants, largely ignoring the fact that most of the project’s funds emanated from Federal sources, nevertheless maintain that, in any event, the so-called public ownership exception to section 2 of article IV articulated in such cases as McCready v Virginia (94 US 391) makes the Toomer-Hicklin test inapplicable to this case. But, though the expenditure of State funds was the major factor relied on by the courts in upholding section 222’s predecessor statute more than 60 years ago (People v Crane, 214 NY 154, affd 239 US 195; Heim v McCall, 214 NY 629, affd 239 US 175), the revolution in section 2 of article IV jurisprudence wrought by Toomer recognized that the State ownership exception was not an indelible canon of constitutional law. Rather, it was premised on a "fiction” designed to highlight the importance of the State’s interest in the exploitation of a resource, a factor that now is weighed along with many others in the dispositive balancing of local and national priorities in such cases (see Baldwin v Montana Fish & Game Comm., 436 US, at pp 385, 386, supra [wild game]; see, also, Hicklin v Orbeck, 437 US, at pp 528-530, supra [oil and gas]). Far from indorsing an approach in which particular resources are categorized according to whether they are passively owned rather than actively created by the State, the recent decisions reaffirm the Constitution’s original intendment by probing the full range and *525 depth of the competing considerations that permeate a particular dispute.[4]
Thus, while the division’s project could, in some of its aspects, be thought to be of local concern, the increasing interdependence of one State on another reflected in the renewed emphasis on the privileges and immunities clause hardly permits that factor to control. That interrelationship indeed is epitomized in this very case by the fact that, as it happens, the project was largely financed by the national Government. Beyond that, one thing is clear above all. It does not outweigh the constitutional concern for the right of a citizen of one State to pursue his vocation in another. And, as to those funds which the State itself invested in this project, it also may not be amiss to suggest, as we have done in the past, that "cost consideration^]” alone need not dictate "judicial outcome” (Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd., 41 NY2d 84, 90).
Called upon to evaluate the competing considerations in the case before us, we therefore conclude that section 222’s potentially absolute barrier to out-of-State public works contractors who seek to market their skills in a legitimate manner within the borders of the State is in conflict with the national policy of economic unity. We further conclude that the State’s interest in allocating its funds to their beneficial owners, its citizens — even if it could achieve that here to any degree — is insignificant in comparison.
It follows that the order of the Appellate Division should be affirmed.

. "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” This provision, commonly referred to as the "interstate privileges and immunities clause”, is to be distinguished from the so-called "national privileges and immunities clause” of the Fourteenth Amendment, which guarantees to all Americans the rights of national citizenship, such as the right to vote for national officials, the right to petition Congress for redress of grievances and the right to enter public lands (see Tribe, American Constitutional Law, §§ 7-2, 7-4). The latter was one of the clauses adopted after the Civil War "primarily to protect the newly freed slaves from oppression at the hands of the state governments in the south” (Hall, Constitutional Law, § 74).

. [2] While we note that it may be settled law that corporations are not "citizens” within the meaning of section 2 of article IV and thus cannot seek protection under the clause, we need not address the consequences, if any, of this doctrine in the present case since none of the parties raised the issue below (see, generally, Paul v Virginia, 8 Wall [75 US] 168; 1 Willoughby, Constitutional Law of the United States [2d ed, 1929], § 161).

. (See text, at pp 520-521, infra.)

. Hughes v Alexandria Scrap Corp. (426 US 794), relied on by the dissent, is not persuasive authority to the contrary. In that case the Supreme Court held that a Maryland program creating a market for abandoned automobile hulks did not burden interstate commerce despite its incidental effect on nonresident metal processors. Here the very target of the statute is the nonresident, and our focus is on the privileges and immunities clause. Moreover, the Hughes court was careful to note that the State had not sought to forbid or regulate the interstate flow of hulks, an allusion to the prohibition against the erection of absolute trade barriers between the States (id., at p 806; see, also, Philadelphia v New Jersey, 437 US 617). In contrast, section 222 may well have the protectionist effect of discouraging nonresident public works contractors from seeking any New York work whatsoever.