181 N.J. Super. 376 (1981)
437 A.2d 733
NESHAMINY CONSTRUCTORS, INC., DAVID A. ROBINSON AND ANTHONY CANUSO, PLAINTIFFS,
v.
DONALD KRAUSE, WILFRED SMITH AND ARTHUR FORBES, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Mercer County.
Decided May 21, 1981.
*377 George F. Kugler for plaintiffs (Archer, Greiner & Read, attorneys).
Neal S. Solomon for defendants (Pellettieri, Rabstein & Altman, attorneys).
Michael S. Bokar, Deputy Attorney General for intervenor, State of New Jersey (James R. Zazzali, Attorney General of New Jersey, attorney).
*378 Charles F. Harris for intervenor-amicus curiae ELSA (Rhoads, Parkin & Harris, attorneys).
DREIER, J.S.C.
This case presents for review the constitutionality of N.J.S.A. 34:9-2, enacted in 1931, governing construction contracts awarded by the state or any other public body. The act requires that "preference in employment thereon shall be given to citizens of the state of New Jersey who have resided and maintained domiciles within the state for a period of not less than one year immediately prior to such employment,"[1] adding only that non-New Jersey citizens may be employed when local citizens are unavailable. The statute goes on to require the inclusion in all such contracts of a provision that noncompliance shall render the contract voidable at the instance of the public body and it makes a violation of the act by a contractor punishable as a disorderly persons offense.
Ewing-Lawrence Sewerage Authority, (ELSA), intervenor-amicus curiae here, has begun a multi-million dollar systems improvement and expansion project largely funded by the Federal Government. On this project plaintiff Neshaminy Constructors, Inc., a Pennsylvania corporation, is a principal contractor. Defendants Donald Krause, Wilfred Smith and Arthur Forbes, all New Jersey citizens, sought employment with Neshaminy for the project but were not hired. They brought suit against plaintiff in Lawrence Township Municipal Court alleging that out-of-state residents had been hired in their stead, in *379 violation of N.J.S.A. 34:9-2.[2] Neshaminy has admitted hiring out-of-state residents and, in this court, challenges the statute. Neshaminy has moved today essentially for summary judgment, seeking a declaration of unconstitutionality. ELSA has made the identical motion.[3] The State of New Jersey, granted the right to intervene as a party under R. 4:28-4(d), has filed a cross-motion for summary judgment upholding the statute. Defendants Krause, Smith and Forbes contend the matter is not in an appropriate posture for summary judgment, there being what defendants assert is a factual issue as to the purposes of the legislation under attack, but contend also that should the court reach the merits, the statute should be upheld.
We will reach the merits. It is conceded by all parties that there is no recorded legislative history regarding this statute. The terms of the statute are unambiguous. There is no dispute that available New Jersey residents were passed over in favor of nonresidents. The question is therefore squarely presented whether, as a matter of law, plaintiff is bound by the provisions of N.J.S.A. 34:9-2.
The major thrust of the challenge to this statute is made under the privileges and immunities clause of the United States Constitution, Art. IV, § 2, which states: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The clause has been construed by the United States Supreme Court as establishing "a norm of comity," Austin v. New Hampshire, 420 U.S. 656, 660, 95 S.Ct. 1191, *380 1194, 43 L.Ed.2d 530 (1975), that is to prevail among the states with respect to their treatment of each other residents.
The purpose is more fully described in Paul v. Virginia, 8 Wall. 168, 19 L.Ed. 357 (1869):
... to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; .... [8 Wall. at 180]
The leading modern exposition of the limitations the clause places on a state's power to weight employment opportunities in favor of its own residents is Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), where the court held the clause bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." 334 U.S. at 396, 68 S.Ct. at 1162. A "substantial reason for the discrimination" would not exist, the court explained, "unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the [discriminatory] statute is aimed." 334 U.S. at 398, 68 S.Ct. at 1163. Moreover, even where the presence or activity of nonresidents causes or exacerbates the problem the State seeks to remedy, there must be a "reasonable relationship between the danger represented by non-citizens, as a class, and the ... discrimination practiced upon them." 334 U.S. at 399, 68 S.Ct. at 1164.
Following the standards established in Toomer, the Supreme Court has recently handed down a decision, Hicklin v. Orbeck, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), which this court finds dispositive of the issue of whether N.J.S.A. 34:9-2 can pass constitutional muster.[4] In that case the State of *381 Alaska required a hiring preference for Alaska residents in all public or private employment arising out of development of the gas and oil rights which the state held. The high court said:
... Even assuming that a state may validly attempt to alleviate its unemployment problem by requiring private employers within the State to discriminate against nonresidents  an assumption made at least dubious by Ward [v. Maryland, 12 Wall 418, 20 L.Ed. 449 (1871)] it is clear that under the Toomer analysis ... [this statute] cannot withstand scrutiny....
[No] showing was made on this record that nonresidents were "a peculiar source of the evil" Alaska Hire was enacted to remedy, namely, Alaska's "uniquely high unemployment" ... What evidence the record does contain indicates that the major cause of Alaska's high unemployment was not the influx of nonresidents seeking employment, but rather the fact that a substantial number of Alaska's jobless residents  especially the unemployed Eskimo and Indian residents  were unable to secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities....
Moreover, even if the State's showing is accepted as sufficient to indicate that nonresidents were "a peculiar source of evil," Toomer ... compel[s] the conclusion that Alaska Hire nevertheless fails to pass constitutional muster. For the discrimination the Act works against nonresidents does not bear a substantial relationship to the particular "evil" they are said to present. Alaska Hire simply grants all Alaskans, regardless of their employment status, education, or training, a flat employment preference for all jobs covered by the Act. A highly skilled and educated resident who has never been unemployed is entitled to precisely the same preferential treatment as the unskilled, habitually unemployed Arctic Eskimo enrolled in a job training program.
........
Even if a statute granting an employment preference to unemployed residents or to residents enrolled in job-training programs might be permissible, Alaska Hire's across-the-board grant of a job preference to all Alaskan residents clearly is not. [437 U.S. at 526-528, 98 S.Ct. at 2487-88, 57 L.Ed.2d at 405-406.]
In the case before this court, the State argues that the New Jersey statute is less broad in its sweep than the Alaska Hire Act, and therefore does not have to carry the burden of meeting the standards followed in Hicklin. This is unpersuasive.
*382 Since Hicklin the New Jersey Supreme Court has demanded a strict compliance with the two-fold analysis used there. Not only must the nonresident be the peculiar source of the evil, but the cure must bear a reasonable relation to that same evil, bearing always in mind that the aim of the clause is substantial equality between the resident and nonresident. In Salorio v. Glaser, 82 N.J. 482 (1980), cert. den. 449 U.S. 804, 101 S.Ct. 49, 66 L.Ed.2d 7 (1980), the court invalidated N.J.S.A. 54:8A-1 et seq., the Emergency Transportation Tax Act, which authorized a tax on the income derived by New Jersey residents from sources outside the State and on the income of out-of-state residents derived from sources within the State. N.J.S.A. 54:8A-1 et seq. was much more narrowly drawn than the statute before this court, and buttressed with legislative findings of a "transportation emergency" deemed to make its provisions necessary. Yet the court said: "Imposition of the [tax] cannot be justified if it appears the tax burden on New York residents is substantially disproportionate to their burden upon New Jersey's transportation facilities." 82 N.J. at 505; emphasis added.
This court also notes that since Hicklin a sister state has had opportunity to consider a situation virtually identical to that here. In Salla v. Monroe Cty., 48 N.Y.2d 514, 423 N.Y.S.2d 878, 399 N.E.2d 909 (1979), cert. den. sub nom. Abrams v. Salla, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 262 (1980), the Court of Appeals of New York confronted a statute providing that in construction of public works, the State, its subdivisions and contractors, had to give preference in employment to New York citizens who had been residents at least 12 months. Challenge was made by out-of-state employees of a private contractor working on a sanitary sewer line for Monroe County and its Division of Pure Waters. The New York court, using the two-fold Toomer-Hicklin test, struck the statute:
... [T]here is nothing to indicate that an influx of nonresidents for any purpose is major cause of our unemployment. Furthermore, though, simplistically viewed, it of course can be said that every position filled by a Pennsylvania resident is one less job for a New Yorker, the statute does not in fact prefer the unemployed over the employed as replacements for dislocated nonresidents. For *383 all that it provides, qualified residents may be drawn away from ongoing employments in order to accept what they may regard as the more attractive opportunities thus created, an inconsistency given considerable weight in Hicklin, supra, [437 U.S.] at pp. 527-528, 98 S.Ct. 2482, 2488-89.
Nor is [this law] geared to focus efficiently on its goal. Instead, with blunderbuss overbreadth, it makes no distinction between supervisory and nonsupervisory employees, giving no consideration at all to the much smaller universe of jobs ... that are in the offing at that level. [423 N.Y.S.2d at 882, 399 N.E.2d 909.]
Exactly the same infirmities exist in the New Jersey law.
In support of its position that the Toomer-Hicklin standards are not appropriate here, the State also argues that New Jersey's proprietary interest in this project removes it from the analysis used in those cases.
In Hicklin the court considered the same assertion and concluded that while a proprietary interest might be a crucial factor in evaluating some statutory discriminations, Alaska's interest was too attenuated to weigh in the balance. 437 U.S. at 529-531, 98 S.Ct. at 2489-90, 57 L.Ed.2d at 406-408. New Jersey argues that Alaska had tried to impose regulation on all hiring, public and private, arising out of use of gas and oil fields, but that New Jersey's regulation is confined to public works projects. The same argument was rejected in Salla v. Monroe Cty., supra, 423 N.Y.S.2d at 883, 399 N.E.2d 909, where the court noted the public works project at issue was largely funded by the Federal Government. So, too, in the case before this court; 80% or more of the millions to be spent are federal monies.[5] Moreover, the court has ELSA's undisputed assertion that even the initiative for the project emanated from the Federal Government.
The totality of this situation is significantly different from that in one case relied on by the State, Hughes v. Alexandria Scrap Corp. 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). *384 There the Supreme Court (using a Commerce Clause analysis) scrutinized a Maryland statute creating a preference for state residents in a program giving payments from the state treasury as an incentive to those who would carry to reprocessing plants abandoned car hulks found within the State of Maryland. Rather then interfering with a naturally functioning interstate market, the court found Maryland had entered the market itself for a specific state purpose, and under these circumstances could direct its buying power to benefit its own citizens if it chose to do so.
Here we have a federal initiative, federal money and significant federal control. The State's proprietary interest is too attenuated to tip the balance, even if such an interest remained a viable basis for avoiding the thrust of Hicklin.
Other cases on which defendants and the State rely either are inapposite or are cast so in doubt by Hicklin as to be unworthy of reliance.[6] This court decides today that Hicklin v. Orberck is dispositive of the issue before it. N.J.S.A. 34:9-2 is unconstitutional as a violation of the Privileges and Immunities Clause.[7] The defendants have urged that depression in the construction *385 industry is serious enough to warrant this discrimination. We must take judicial notice, however, that the problem exists throughout this whole area of the country, and that a substantial portion of whatever building is under way is publically funded.
As Mr. Justice Cardozo observed in Baldwin v. G.A.F. Seelig, 294 U.S. 511, 523 [55 S.Ct. 497, 500] 79 L.Ed. 1032 ... (1935) the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." [Hicklin, 437 U.S. at 534, 98 S.Ct. at 2492]
New Jersey, absent a special showing of specific dangers posed by out-of-state employees, may not attempt to resolve its problems on the backs of citizens of our neighboring states.
NOTES
[1] This durational residency requirement is not at issue since both defendants and the State concede it is unconstitutional in the wake of Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and its progeny. The general constitutionality of this statute was left open in Labor & Industry Dept. v. Cruz, 45 N.J. 372 (1965), where a companion statute, N.J.S.A. 34:9-1, was declared unconstitutional. This court has examined that opinion, as well as the record on appeal before the Supreme Court, and finds that the arguments presented in Cruz are not germane to those in this case. N.J.S.A. 34:9-2 must stand or fall based upon completely separate considerations.
[2] By order consented to by plaintiffs and defendants, the municipal court and all other Lawrence Township municipal authorities were restrained by Judge A. Jerome Moore from undertaking further proceedings until a declaratory judgment should issue in this proceeding.
[3] Counsel have agreed that this court should respond to the request for relief made by Neshaminy alone. We do not, therefore, decide the question of whether a party permitted to intervene as amicus curiae under R. 1:13-9 may seek affirmative relief.
[4] The court notes that even preHicklin a doubt existed concerning this statute. In 1977 the State Director of Building and Construction issued a memo in which he informed his staff that, "[most] public agencies in New Jersey have not enforced [this law] since it was thought the law was unenforceable..." The purpose of the memo was to let the staff know the Attorney General had instructed him enforcement was necessary until a court ruled otherwise.
[5] As grantees of federal moneys, plaintiffs must comply with applicable federal regulation. See 40 C.F.R. 25.936-2b, which prohibits grantees from giving preference to New Jersey contractors. 40 C.F.R. 35.938-4 also requires notice of bidding to be circulated nationwide.
[6] Cases relating to public employment (as opposed to private employment on public works) are inapposite-see Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), clarifying the nature of the states' interest in public employment. An example of a case presumptively overruled by Hicklin is People ex rel. Holland v. Bleigh Construction Co., 61 Ill.2d 258, 335 N.E.2d 469 (Ill. 1975), cited by the State, in which Illinois considered a statute almost identical with that here, but gave it a cursory preHicklin privileges and immunities analysis. We are unpersuaded Illinois would decide the same way now.
[7] Plaintiffs have also raised an equal protection argument. This court considers it unlikely they would have prevailed on that ground, see Salorio 82 N.J. at 513-516, but expressly does not reach the issue. Nor does the court reach plaintiff's last argument, that N.J.S.A. 34:9-2 is implicitly overruled by an amendment to New Jersey's anti-discrimination statutes, N.J.S.A. 10:2-1 and N.J.S.A. 10:5-4. This argument was critical to the 1965 decision of the New Jersey Supreme Court barring employment discrimination against aliens. See footnote 1, supra.