1ST WESTCO CORP., Richard J. Lee, Troy Lyles, Carl Haines, Charles J. Fuller, Stanley Yakupchina, Todd Curtis, and Roosevelt Whitehead, Plaintiffs,

v.

SCHOOL DISTRICT OF
PHILADELPHIA,
Defendant,

v.

Ernest D. PREATE, Jr., Individually and in his official capacity as Attorney General of the Commonwealth of Pennsylvania,

and

Donald M. Carroll, Jr., Individually and in his official capacity as Secretary of Education of the Commonwealth of Pennsylvania, Third–Party Defendants.

Civ. A. No. 91–2727.

United States District Court,
E.D. Pennsylvania.

Jan. 8, 1993.

Roy S. Cohen, Cohen & Green, P.C., Philadelphia, PA, for plaintiffs.

Jackie B. Sparkman, Sally Akan, School Dist. of Philadelphia, Office of General Counsel, Philadelphia, PA, for defendant School Dist. of Philadelphia.

Richard C. McNeill, Sagot, Jennings & Sigmond, Philadelphia, for movants Metropolitan Dist. Council of Philadelphia and Vicinity, United Broth. of Carpenters and Joiners of America, Metropolitan Dist. Council of Carpenters of Philadelphia and Vicinity.

Charles T. Joyce, Willig, Williams & Davidson, Philadelphia, PA, for movant Glaziers, Architectural Metal and Glassworkers Union Local 252.

Susan J. Forney, Office of Atty. Gen., Harrisburg, PA, for defendant Com. of Pa., and third-party defendants Ernest D. Preate, Jr., and Donald M. Carroll, Jr.

## OPINION

GAWTHROP, District Judge.

Before the court are the cross-motions for summary judgment of the plaintiffs and the third-party defendants. Plaintiffs, 1st Westco Corp., a New Jersey corporation, and some individual employees of 1st Westco who are residents of New Jersey, seek a declaratory judgment that § 7–754 of the Pennsylvania Public School Code violates the Privileges and Immunities Clause and the Commerce Clause of the United States Constitution. That statute provides, in full:

> The specifications upon which contracts are entered into by any school district for the construction, alteration, or repair of any public works, shall contain the provision that laborers and mechanics employed on such public works shall have been residents of the Commonwealth for at least ninety days prior to their employment. Failure to keep and comply with such provision shall be sufficient legal reason to refuse payment of the contract price to the contractor.

Act of March 10, 1949, P.L. 30, art. VII, § 754, 24 P.S. § 7–754. Third-party defendants, the Attorney General and the Secretary of Education of the Commonwealth of Pennsylvania, argue that the statute is constitutional because there is a "substantial reason" for the statute's conceded discrimination against non-resident workers: Pennsylvania's interest in reducing the unemployment rate among its construction workers.

Because I find that this statute unconstitutionally discriminates against non-Pennsylvanians, and that Pennsylvania has shown no substantial reason for the discrimination, I shall grant plaintiffs' motion for summary judgment and deny third-party defendants' motion for summary judgment.

## BACKGROUND

The material facts of this case are not in dispute. The School District of Philadelphia entered into three contracts with 1st Westco for window construction and renovation on three of the district's buildings. 1st Westco assigned the individual plaintiffs, Messrs. Lee, Lyles, Haines, Fuller, Yakupchina, Curtis, and Whitehead, all of whom are New Jersey residents, to work on the Philadelphia school projects. Shortly after 1st Westco began work on the projects, the School District sent 1st Westco a stop-work order. After a brief investigation, the School District informed 1st Westco that since it was using New Jersey residents on the school projects, it was in violation of 24 P.S. § 7–754. 1st Westco then took the individual plaintiffs off the Philadelphia school projects and hired Pennsylvania residents to complete the projects.

Before the School District ordered 1st Westco to stop work on the projects, it sought the advice of the Pennsylvania Department of Education on the constitutionality of § 7–754. The Department of Education, in turn, sought the advice of the Attorney General of Pennsylvania. The Attorney General issued an advisory opinion stating that "this statute is constitutional and must be enforced by the Department." Plaintiffs' Reply Memorandum to Defendants' Motion for Summary Judgment, Exhibit A, at 2. The Department of Education's Chief Counsel then wrote the School District, advising it "that the Department of Education and the School District of Philadelphia are obliged to abide by Section 754 of the Public School Code unless and until it is modified or struck down.

I know that this ruling leaves the School District of Philadelphia in a difficult position and that litigation may be one result." *Id.* at 1.

■ After issuance of the stop-work order, 1st Westco and the individual plaintiffs filed this suit against the School District of Philadelphia and the Commonwealth of Pennsylvania. The School District, in turn, joined the Attorney General and the Secretary of Education as third-party defendants. I denied the Attorney General's and the Secretary of Education's motions to dismiss [1] and granted the Commonwealth's unopposed motion to dismiss under the Eleventh Amendment.

The School District has tendered its defense to the third-party defendants, and therefore it did not brief, and only briefly argued, the motions now before the court.

### DISCUSSION

*Standard of Review*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). A party opposing summary judgment must marshal sufficient facts to show that there is a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In this case, all the parties agree, as do I, that there are no issues of material fact.

*The Privileges and Immunities Clause*

■ "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const.

art. IV, § 2, cl. 1. As the Supreme Court has stated, "one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). The individual plaintiffs argue that 24 Pa.C.S. § 7–754 deprives them of the privilege of working on school construction jobs in Pennsylvania, and that the statute therefore violates the Privileges and Immunities Clause.

■ In *Toomer,* the Court held that the Privileges and Immunities Clause bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162. The Court went on to hold that the purpose of the Clause "is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Id.* at 398, 68 S.Ct. at 1163. In order for a discriminatory statute to withstand constitutional scrutiny, there must be a "reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them" by the statute. *Id.* at 399, 68 S.Ct. at 1164.

The Supreme Court applied the *Toomer* analysis in the employment context in *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978). There, the state of Alaska enacted a statute called "Alaska Hire," which required employers to give preference to Alaska residents when hiring people to work on oil or gas pipelines. Nonresident prospective employees challenged Alaska Hire under the Privileges and Immunities Clause. The state defended on the ground that the statute was directed toward reducing unemployment in Alaska. The Supreme Court unanimously held the statute unconstitutional

---

1. *1st Westco Corp. v. School Dist. of Philadelphia,* Civ. A. No. 91–2727, 1991 WL 276062 (E.D.Pa. Dec. 18, 1991). I held that the Attorney General's and the Secretary of Education's "involvement in the process that led to plaintiffs' dismissal from the job, and their respective responsibilities for law enforcement and oversight of the educational system, suffice to trigger a duty to defend the statute." *1st Westco,* 1991 WL 276062, at *8. I reaffirm that holding here.

because Alaska had not shown that "non-residents were a 'peculiar source of the evil' Alaska Hire was enacted to remedy." *Hicklin,* 437 U.S. at 526, 98 S.Ct. at 2488. The Court went on to hold that even if Alaska had shown that nonresidents were a peculiar source of some evil, the statute did "not bear a substantial relationship to the particular 'evil' they are said to present. Alaska Hire simply grants all Alaskans, regardless of their employment status, education, or training, a flat employment preference for all jobs covered by the Act." *Id.* at 527, 98 S.Ct. at 2488. The Court concluded: "If Alaska is to attempt to ease its unemployment problem by forcing employers within the State to discriminate against nonresidents—again, a policy which may present serious constitutional questions—the means by which it does so must be more closely tailored to aid the unemployed the Act is intended to benefit." *Id.* at 528, 98 S.Ct. at 2488.

The Supreme Court again confronted a Privileges and Immunities challenge to a preferential employment statute in *United Bldg. & Constr. Trades Council v. Mayor & City Council of Camden,* 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). There, the Court considered a Camden, New Jersey, ordinance which required that at least 40% of workers on city construction projects be residents of the city of Camden. The city argued that the ordinance was necessary to combat "grave economic and social ills" such as "spiralling unemployment." *United Bldg.,* 465 U.S. at 222, 104 S.Ct. at 1029–30. The Court found the record insufficient to permit proper evaluation of Camden's justifications, and remanded the case to the state system for a *Toomer/Hicklin* analysis. The case then settled. The Court did hold, however, that the Privileges and Immunities Clause protects the "fundamental" right of nonresidents to seek employment with private con-

tractors engaging in public works projects. *United Bldg.,* 465 U.S. at 221–22, 104 S.Ct. at 1029–30.

■ The defendants in this case admit that § 7–754 discriminates against non-Pennsylvanians. Indeed, the statute's language and purported purpose—reducing unemployment in the Pennsylvania construction industry—clearly discriminate against non-Pennsylvanians. Thus, the defendants must show, under *Toomer* and *Hicklin,* a substantial justification for the discriminatory statute. To do so, they must demonstrate (1) the particular evil which the statute is intended to address, (2) that nonresidents are a peculiar source of that evil, and (3) that the statute's approach bears a substantial relationship to the evil.

Defendants have identified the evil which § 7–754 was enacted to combat: unemployment in Pennsylvania's construction industry. However, defendants have failed to demonstrate that non-Pennsylvanians are a peculiar source of that evil, or that § 7–754 is "closely tailored to aid the unemployed the Act is intended to benefit." *Hicklin,* 437 U.S. at 528, 98 S.Ct. at 2488.

Plaintiffs and defendants have both submitted expert reports which outline the impact which nonresident construction workers and § 7–754 have on unemployment in the Pennsylvania construction industry. According to the Pennsylvania Business Survey of June, 1992, there are 207,000 people employed in the construction industry in Pennsylvania. That survey also instructs that new school construction accounted for 1.5% of all construction in the Commonwealth. The 1980 U.S. Census reported that 3.4% of Pennsylvania construction workers reside in states adjacent to the Commonwealth. Based on these and other statistics, plaintiffs' experts estimate that § 7–754 affects, at most, 92 jobs.[2]

**2.** These statistics were presented in plaintiffs' expert report, and are not disputed by defendant, except for the ultimate estimate that the statute affects only 92 jobs. In making this estimate, plaintiffs' experts relied on the Pennsylvania Business Survey's information that *new* school construction accounted for 1.5% of all

construction in Pennsylvania, rather than an estimate on the contribution of *overall* school construction to the construction industry. Since plaintiffs' estimate seems only to account for new school construction jobs, the estimate may somewhat understate the actual number of jobs which § 7–754 could affect. Fairly stated,

Plaintiffs' experts then proceed to estimate that § 7–754 is capable of reducing the unemployment rate in the Pennsylvania construction industry by only 0.037%.

Defendants' expert does not specifically estimate the number or percentage of jobs that are or could be affected by the statute, but he does agree, at page 7 of his initial report, that "the legislation in question in the instant case pertains to a very small part of the labor force to begin with, and indeed even smaller than that, since it relates to only a very small part (school district activity in this industry) of construction as a whole." Defendants' Motion for Summary Judgment, Exhibit 1, at 13. At page 5 of his response to plaintiffs' expert report, defendants' expert writes: "the important thing to note is that there is agreement that the unemployment impact of out-of-state hiring is relatively small." *Id.* at 46. In fact, even if the estimate of plaintiffs' experts were so inadequate as to account for only one third of the statute's true effect, the effect of the statute would be to reduce the unemployment rate by slightly more than one-tenth of one percent.

The minuscule effect which § 7–754 has on the unemployment rate in Pennsylvania's construction industry demonstrates that nonresident construction workers are not a peculiar source of unemployment among Pennsylvania's construction workers. The U.S. Bureau of Labor Statistics reported in July, 1992, that the unemployment rate in the construction industry in Pennsylvania was 16.5%. Were § 7–754 enforced to its fullest extent, the rate might drop to 16.4%. The unemployment rate in the construction industry in Pennsylvania has historically been higher than the overall unemployment rate. Unemployment in construction also tends to fluctuate more than the overall rate, and the rate grows much larger in times of recession. The higher rates and greater fluctuations are not, however, the result of a flood of non-resident construction workers pouring into the Pennsylvania market. Rather, these phenomena are the results of the ebb and flow of supply and demand. The supply of construction workers has historically been high, while the demand for their services has varied with the economic fortunes of the Commonwealth. Nonresident workers who work on publicly funded school construction projects are simply not a "peculiar source of the evil" of unemployment which plagues the Pennsylvania construction industry.

This case is not this constitutional question's maiden voyage across the Delaware. In *Neshaminy Constructors v. Krause*, 181 N.J.Super. 376, 437 A.2d 733 (Ch.Div. 1981), *modified*, 187 N.J.Super. 174, 453 A.2d 1359 (App.Div.1982), the Chancery Division of the New Jersey Superior Court held that a New Jersey public works construction preference statute violated the Privileges and Immunities Clause. New Jersey, like the defendants in this case, argued that its statute was aimed at alleviating unemployment in the state's construction industry. The suit was brought by Pennsylvania construction workers wishing to land jobs in New Jersey. The court held: "New Jersey, absent a special showing of specific dangers posed by out-of-state employees, may not attempt to resolve its problems on the backs of citizens of our neighboring states." *Neshaminy Constructors*, 437 A.2d at 738.

Defendants argue that the small effect which the statute and nonresident construction workers have on the unemployment rate demonstrates that § 7–754 is narrowly tailored to aid Pennsylvania's unemployed construction workers. Therefore, the argument goes, the statute is unlike the broad Alaska Hire statute, and it survives *Hicklin* analysis. However, this statute is not narrowly drawn to aid unemployed construction workers. The statute does not require employers to replace nonresident workers with unemployed Pennsylvanians.

plaintiffs' experts estimate that, at most, 92 *new* school construction jobs are affected by the statute. This estimate fails to include jobs such as those actually performed by 1st Westco and its employees in this case: repairs on already existing schools. However, since all the parties agree, as do I, that the effect of § 7–754 on unemployment in the construction industry is slight, I shall not dwell on this minor statistical inadequacy.

Employers may, as 1st Westco did in this case, simply shift workers around so that Pennsylvania residents work on Pennsylvania school projects, and residents of other states work on other projects. Alternatively, Pennsylvania workers engaged in ongoing non-school projects might leave those projects to take more attractive school construction jobs, and those workers might well be replaced by non-Pennsylvanians. In either event, the result would be that Pennsylvania construction workers would achieve no net gain in employment. The New York Court of Appeals relied on similar reasoning when it invalidated a public works construction employment preference statute which was challenged by a group of Pennsylvania construction workers wishing to work in New York. *Salla v. County of Monroe*, 48 N.Y.2d 514, 423 N.Y.S.2d 878, 399 N.E.2d 909 (1979), *cert. denied sub nom. Abrams v. Salla*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 262 (1980).

It could also be argued that § 7–754, if fully enforced, would actually harm the very unemployed construction workers it was intended to benefit. In this case, for example, 1st Westco, the lowest bidder, would not have been awarded the contracts, had the school district known that 1st Westco intended to use nonresident workers. The contracts would have been awarded to the next-lowest bidder, costing the school district, the Commonwealth, and ultimately the taxpayers, more money. The higher costs of contracts such as these would leave less money in the Commonwealth's educational coffers for other construction projects, and this could cause the cancellation of some projects altogether. Thus, the enforcement of § 7–754 could reduce the overall number of school construction projects, thereby reducing the overall number of construction jobs and violating the very purpose for which the statute was supposedly enacted.

Even the most cursory glance at § 7–754 reveals that this statute is not narrowly drawn. Rather, it was painted with a brush as broad as the one used by the Alaska legislature in drafting Alaska Hire. This is not merely a statute which prefers qualified, yet unemployed, Pennsylvanians over non-Pennsylvanians. This statute, for no substantial reason, absolutely prohibits all non-Pennsylvanians from working on public school construction projects in Pennsylvania. Section § 7–754 suffers from the same "blunderbuss overbreadth" as did the statute invalidated by the New York court. *Salla*, 423 N.Y.S.2d at 882, 399 N.E.2d at 914.

Finally, I am most mindful of the Supreme Court's instruction that "[e]very inquiry under the Privileges and Immunities Clause 'must be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.'" *United Bldg.*, 465 U.S. at 222–23, 104 S.Ct. at 1030 (quoting *Toomer*, 334 U.S. at 396, 68 S.Ct. at 1162.) The Court also advised that "[t]his caution is particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls." *United Bldg.*, 465 U.S. at 223, 104 S.Ct. at 1030. However, this leeway does not give the states license to disregard the Privileges and Immunities Clause altogether. Section 7–754 cannot survive *Toomer/Hicklin* analysis, and therefore it must be struck down under the Privileges and Immunities Clause.

*The Commerce Clause*

■ Since I have held that § 7–754 is violative of the Privileges and Immunities Clause, I need not reach 1st Westco's additional challenge to the statute under the Commerce Clause. I do observe, however, that *Trojan Technologies v. Commonwealth*, 916 F.2d 903 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991), instructs the court that the Commonwealth acts as a market participant, rather than a market regulator, when it regulates the expenditures of its political subdivisions. School districts are defined to be political subdivisions of the Commonwealth by Act of March 8, 1978, P.L. 673, No. 3, § 6, 73 P.S. § 1886. Under *White v. Massachusetts Council of Constr. Employers*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), states are not

subject to the Commerce Clause when they act as market participants.