## State ex rel, Collins, Attorney-General *v.* Senatobia Blank Book & Stationery Co.

### [76 South. 258, In Banc.]

1. COMMERCE. *Interstate commerce. Constitutional provisions.*

   Laws 1916, chapter 135, section 3, prohibiting the letting by boards of supervisors of counties of contracts to furnish the county with blank books, stationery, etc., to any bidder who is a nonresident of the state, who has not a printing plant in the state or who is not a *bona-fide* resident of the state actually engaged in the printing business is not violative of article 1, section 8 of the Constitution of the United States giving Congress the right to regulate commerce among ·the several states, since such provision of the Constitution is not intended to affect contracts which have an indirect or remote bearing on commerce between the state.

2. SAME.

   It is only direct interference with the freedom of interstate commerce that brings the case within the exclusive domain of federal legislation, the state in the exercise of its police power may make regulations which indirectly affect interstate commerce.

3. CONSTITUTIONAL LAW. *Privileges and immunities.*

   Chapter 135, section 3, Laws 1916, is not violative of Constitution of the United States, article 4, section 2, providing that the citizens of each state shall be entitled to all the privileges and immunities of citizens of the several states, since counties are mere political subdivisions of the state for the purpose of exercising a part of its powers and may exert only such powers as are expressly granted to them or necessarily implied from those granted, hence regulation of their contracts is a regulation of the contracts of the state and no one is entitled to absolute right to contract with the state.

4. CONSTITUTIONAL LAW. *Privileges and immunities. Due process of law. Equal protection of laws.*

   Chapter 135, section 3, Laws 1916, is not violative of the Constitution of the United States, amendment 14(A), providing that no state shall make or enforce any law which shall abridge the privilege or immunities of the citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law nor deny to any person within its jurisdiction the equal protection of the law.

5. COUNTIES. *Contracts. Constitutional and statutory provisions.*

   Section 3, chapter 135, Laws 1916, is not violative of section 107 of the Constitution, providing that stationery, printing, etc., used by the legislature and other departments of the Government shall be performed under contracts subject to the approval of the governor and state treasurer, since a county is not a department of the state but a political subdivision.

6. CONSTITUTIONAL LAW. *Wisdom of statute. Legislative question.*

   With the wisdom of a legislative act the courts have nothing to do, that is a matter entirely for the lawmaking body. It is solely the duty of the court to say whether or not the act as passed by the legislature is violative of any of the provisions of the state or federal Constitutions.

7. QUO WARRANTO. *Grounds. Exercise of corporate franchise and powers.*

   Under section 417, Code 1906, *quo warranto* was the correct procedure for the attorney-general of the state to pursue, where a corporation practiced fraud in obtaining its charter and the acts of the alleged corporation under its charter have all been in violation of law.

8. QUO WARRANTO. *Admissions.. Demurrer.*

   A demurrer to an information in a *quo warranto* proceeding admits all the allegations contained in the information and it is the duty of the supreme court on appeal in reversing the case, to assume that the allegations are true as stated.

APPEAL from the circuit court of Tate county.

HON. E. D. DINKINS, Judge.

*Quo warranto* by the state, on the relation of Ross A. Collins, Attorney-General, against the Senatobia Blank Book & Stationery Company. From a judgment of the court sustaining a demurrer to the information and dismissing the case, the relator appeals.

The facts are sufficiently stated in the opinion of the court.

*R. H., J. H. and Fulton Thompson* and *Ross A. Collins,* Attorney-General, for appellant.

*Mayes, Wells, May & Sanders,* for appellee.

SYKES, J., delivered the opinion of the court.

This was a *quo warranto* proceeding instituted in the circuit court of Tate county by the state of Mississippi, on the relation of the Attorney-General, against appellee, a corporation, organized under the laws of Mississippi, domiciled in Tate county. The defendant demurred to the information, which demurrer was sustained by the circuit court, and the cause dismissed; from which judgment sustaining the demurrer, this appeal is prosecuted.

Among other things, the information alleged: That shortly after the passage of chapter 135, Laws of 1916 (p. 193), prohibiting the letting by boards of supervisors of the several counties of contracts to furnish the counties with blank books, stationery, etc., to any bidder who is a nonresident of the state of Mississippi, who has not a printing plant in the state, or who is not a *bona-fide* resident of the state actually engaged in the printing business, the charter of incorporation of appellee was applied for and granted. That the objects and purposes of the application for this charter of the appellee were not to enable it to do a lawful business in the state, but that its objects and purposes were unlawful and fraudulent; its objects and purposes were to circumvent the statutes of the state and to perpetrate a fraud on the laws of the state. That the objects and purposes of the incorporators were to enable Geo. D. Barnard & Co., of St. Louis, Mo., a nonresident printing, blank book, and stationery company, to make contracts with the various boards of supervisors of the counties of the state in the name of the appellee company for the furnishing of the blank books and stationery and necessary printing required by law to be done by them.

A part of the information reads as follows:

"In short, the defendant company was incorporated to be, and is, a mere dummy of the said Geo. D. Barnard & Co. Defendant company never has had, and has not now, a printing nor a blank book nor a stationery plant

in this state of sufficient capacity to execute the contracts which it has obtained formerly from several counties of the state, as hereinafter shown, nor to execute the several contracts which it has sought to obtain from any other counties. Its entire purpose has been to obtain contracts for blank books, stationery, and printing from the counties in its name and to have the said contracts executed by Geo. D. Barnard & Co., the aforesaid nonresident printing, stationery, and blank book company.

"In pursuance of such fraudulent intent and purpose, and with the design and intent to defeat the laws of this state, the said defendant corporation, falsely pretending to be a *bona-fide* resident of this state and a domestic printing, blank book, and stationery company, has deceived and defrauded the boards of supervisors of various counties of this state."

The information prays for judgment of forfeiture and ouster against the appellee.

The demurrer admits the allegations alleged in the information, and its sole object and purpose is to challenge the constitutionality of chapter 135 of the Laws of 1916 (p. 193).

Section 1 of this act provides the method to be followed by the board of public contracts in the making of contracts for the state printing proper and for the different departments of the state government. That section of the act does not deal with the contracts for printing stationery, etc., for the counties. Section 3 of the act relates to the letting of the contracts by the various boards of supervisors and is the act before us for construction. As amended, this act now reads as follows:

"The boards of supervisors of the several counties of the state shall, on the last Monday in July, 1916, or as soon thereafter as practicable, and on a corresponding date every two years thereafter, after having advertised in some local newspaper for thirty days inviting sealed proposals, let to the lowest responsible bidder

115 Miss.—17

contracts for the purpose of record and blank books, tax receipts, warrant books, pay certificates, stationery, office supplies, legal form and such other books and blanks as are used by the county and district officers. They shall classify same into the following classes: (1) Blank books and record books; (2) printed blanks and printed stationery; (3) ruled and printed blanks; (4) tax receipts, warrants and such forms in simple binding; (5) stationery and office supplies and furniture, not including specially ruled or printed work; and the same shall be let by classes, and all contracts for county printing of the second and third classes shall be by the supervisors and awarded to the lowest responsible bidder of local printing establishments in the respective counties, provided the same can be satisfactorily done there. Also local dealers of the various counties shall be allowed the same privileges of bidding for the furnishing of files, furniture, etc., in the fifth class, as is herein provided for the local printing establishments for the second and third class. If no contract is made for any one of the schedules except those held by the local printers of the respective counties, the officers shall buy supplies not contracted for through the contractor, provided his prices are equal to those of other printing establishments. Contracts for other classes may be awarded to worthy and capable printing establishments of this state, actually engaged in the printing business, and paying taxes thereon in the state, and classified schedules shall be furnished by the board of supervisors to prospective bidders on request, clearly showing and clearly defining what is wanted of each of said classes of work, and, besides, the clerk of the board of supervisors shall, at least ten days before the awarding of contracts, forward by mail, postage prepaid, such classified schedules to at least twelve printers or printing establishments of character and ability, all of whom shall be residents of this state. Proposals shall be ad-

dressed to the clerk of the board of supervisors and shall be so marked as to designate what it is."

The demurrer in this case challenges: First, the constitutionality of this act, alleging that it violates the commerce clause, section 8, article 1, of the federal Constitution; second, that it violates section 1 of the Fourteenth Amendment of the federal Constitution; and, third, that it violates section 107 of the Constitution of Mississippi; fourth, that said information does not charge any present or past violation of any law. It is also argued in the brief of the appellee that this act is violative of article 4, section 2, of the federal Constitution. There are other assignments in the demurrer, but they are not seriously pressed upon us by the appellee, and we do not think it necessary to notice any save those above enumerated.

We shall first consider the question as to whether or not this act is violative of any of the provisions of the Constitution of the United States above mentioned. Article 1, section 8, gives Congress the right "(3) to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Article 4, section 2:

"(1) The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

Section 1 of the Fourteenth Amendment:

"(a) No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

That the legislature has the power to enact laws regulating the letting of contracts for its printing and that of its subdivisions is not and cannot be questioned. That the county is a subdivision of the state is also not questioned.

The first question, then, is: Does this act violate any
of the enumerated provisions of the federal Constitu-
tion? The act in question does not attempt to regulate
any contracts save those of the state itself and its sub-
divisions, which are, upon the last analysis, contracts of
the state. In other words, by this act the state is but
regulating and saying with whom it will make its own
contracts for work of this character. It is well also to
bear in mind that an individual has a perfect right to
make a contract with any one whom he pleases. It fol-
lows, also, that the state has a right to make a contract
with any one whom it pleases unless it contravenes in .
some way either the federal or the state Constitution.
The law in question in no way attempts to regulate in-
terstate commerce. The section of the act in question is
a direction to the officers of the counties prescribing the
manner and from whom they shall receive bids for the
county supplies mentioned in the act. These county
officers are agents of the county and can only act by leg-
islative authority, and in the making of these contracts
these acts only relate to the regulation of the state's and
its subordinates' own business. Neither the state nor
any county can be forced, without its permission, to en-
ter into a contract with an individual or a corporation
without its (the state's) permission, unless there is some
provision in one of these Constitutions requiring it to do
so. There is no such express provision in either of the
Constitutions. While the state cannot be compelled
without its consent to enter into a contract with any in-
dividual or corporation, yet the act in question expressly
provides how both resident and nonresident citizens or
corporations may qualify to bid for the work provided
for under this act. The sum and substance of the act is
merely to compel those who desire to do this work for
the state or its subdivisions to become amenable to the
process of the courts of the state and to do certain of
the work within the limits of the state. These are rea-
sonable regulations for the welfare of the state and its

subdivisions; the object being to protect the state from bidders who are without the jurisdiction of the state and also having in view the upbuilding of the state by the construction within its limits of the establishments necessary to do this work. This may very well be classed as a police regulaton.

In these days of quick communication and transportation among the states of the Union, in its broadest sense, any contract made by a state or its subdivision may in some way indirectly affect interstate commerce. That is to say, most likely some of the raw or manufactured material which may be used in its public buildings or in the furnishing or outfitting of any of the county or state offices, may be transported into the state from another state. This in no way is an interference with interstate commerce. The supreme court of the United States, in a case which is directly in point on this proposition, has stated the law in these apt terms:

"The right of a state, in the exercise of the police power, to make regulations which indirectly affect interstate commerce, has been frequently sustained. In the present case it may be that the use of this kind of asphalt, under municipal authority conferred by the state, will in a limited degree affect interstate commerce; but it certainly is not one of those direct interferences with the power over, and express control of, the subject given by the Constitution to Congress. In this day of multiplied means of intercourse between the states there is scarcely any contract which cannot, in a limited or remote degree, be said to affect interstate commerce. But it is only direct interferences with the freedom of such commerce that bring the case within the exclusive domain of federal legislation." *Field* v. *Barber Asphalt Paving Co.,* 194 U. S. 618, 24 Sup. Ct. 784, 48 L. Ed. 1142.

In the case above quoted from, in further discussing the question as to whether or not the commerce clause of the federal Constitution was violated, the court says:

"It is not intended to affect contracts which have a remote and indirect bearing upon commerce between the states."

It was necessary to transport into the state of Missouri the asphalt contracted for in that work.

The remaining objections to this law, under the federal Constitution, are disposed of in the case of *Atkin* v. *Kansas,* 191 U. S. 207, 24 Sup. Ct. 124, 48 L. Ed. 148. The state of Kansas passed laws making it a criminal offense for a contractor to permit or require an employee to perform labor upon public works in excess of eight hours a day. This law was violated by the appellant, who was convicted, and prosecuted an appeal to the Supreme Court of the United States. The appellant Atkin, when he violated this law, was constructing a brick pavement for the municipality of Kansas City. The contention of the appellant in that case was that the law in question violated the first section of the Fourteenth Amendment.

"These questions—indeed, the entire argument of defendant's counsel—seem to attach too little consequence to the relation existing between a state and its municipal corporations. Such corporations are the creatures— mere political subdivisions—of the state, for the purpose of exercising a part of its powers. They may exert only such powers as are expressly granted to them, or such as may be necessarily implied from those granted. What they lawfully do of a public character is done under the sanction of the state. They are, in every essential sense, only auxiliaries of the state for the purposes of local government. They may be created, or, having been created, their powers may be restricted or enlarged or altogether withdrawn at the will of the legislature; the authority of the legislature, when restricting or withdrawing such powers, being subject only to the fundamental condition that the collective and individual rights of the people of the municipality shall not thereby be destroyed. (Citing authorities.) In the case last

cited (*Williams* v. *Eggleston,* 170 U. S. 304, 310, 18 Sup.
Ct. 617, 42 L. Ed. 1047, 1049), we said that 'a municipal
corporation is, so far as its purely municipal relations
are concerned, simply an agency of the state for con-
ducting the affairs of government, and as such it is sub-
ject to the control of the legislature.'   .   .   .

"The improvement of the boulevard in question was a
work of which the state, if it had deemed it proper to
do so, could have taken immediate charge by its own
agents; for it is one of the functions of government to
provide public highways for the convenience and com-
fort of the people. Instead of undertaking that work
directly, the state invested one of its governmental
agencies with power to care for it. Whether done by
the state directly or by one of its instrumentalities, the
work was of a public, not private, character.

"If, then, the work upon which the defendant em-
ployed Reese was of a public character, it necessarily
follows that the statute in question, in its application to
those undertaking work for or on behalf of a municipal
corporation of the state, does not infringe the personal
liberty of any one. It may be that the state, in enacting
the statute, intended to give its sanction to the view
held by many that, all things considered, the general
welfare of employees, mechanics, and workmen, upon
whom rest a portion of the burdens of government, will
be subserved if labor performed for eight continuous
hours was taken to be a full day's work; that the re-
striction of a day's work to that number of hours would
promote morality, improve the physical and intellectual
condtion of laborers and workmen, and enable them the
better to discharge the duties appertaining to citizen-
ship. We have no occasion here to consider these ques-
ties, or to determine upon which side is the sounder
reason; for, whatever may have been the motives con-
trolling the enactment of the statute in question, we can
imagine no possible ground to dispute the power of the
state to declare that no one undertaking work for it or

for one of its municipal agencies should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part of the liberty of any contractor that he be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to reveiw its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern.

"If it be contended to be the right of every one to dispose of his labor upon such terms as he deems best—as undoubtedly it is—and that to make it a criminal offense for a contractor for public work to permit or require his employee to perform labor upon that work in excess of eight hours each day is in derogation of the liberty both of employees and employer, it is sufficient to answer that no employee is entitled, of absolute right and as a part of his liberty, to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do.

"So, also, if it be said that a statute like the one before us is mischievous in its tendencies, the answer is that the responsibility therefor rests upon legislators, not upon the courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and, upon grounds merely of justice or reason or wisdom,

annul statutes that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of courts in cases before them to guard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution. It cannot be affirmed of the statute of Kansas that it is plainly inconsistent with that instrument; indeed, its constitutionality is beyond all question." Atkin v. Kansas, 191 U. S. 207, 24 Sup. Ct. 124, 48 L. Ed. 148.

The same contentions so earnestly and ably insisted upon by the appellee in the present case were insisted upon in the Atkin Case, so liberally quoted from. Paraphrasing part of the above quotation, a complete answer to the argument in this case of appellee is as follows: It is sufficent to answer that no person engaged in the stationery business is entitled, of absolute right and as a part of his liberty, to contract with or to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do.

The act in question in no way violates any provision of the federal Constitution.

It is contended by the appellee that the act violates section 107 of the Constitution of the state of Mississippi, which reads as follows:

"All stationery, printing, paper, and fuel, used by the legislature, and other departments of the government, shall be furnished, and the printing and binding of the laws, journals, department reports, and other printing and binding, and the repairing and furnishing the halls and rooms used for the meeting of the legislature and its committees, shall be performed under contract, to be

given to the lowest responsible bidder, below such maximum and under such regulations as may be prescribed by law. No member of the legislature or officer of any department shall be in any way interested in such contract, and all such contracts shall be subject to the approval of the Governor and State Treasurer.''

A complete answer to this contention is that section 107 is not in question here. It only relates, according to its plain provisions, to contracts for the stationery, etc., of the legislature and other departments of the state government, which contracts are subject to the approval of the Governor and the State Treasurer. The contracts of subdivisions of the state, such as counties, are not intended to be approved by the Governor and the State Treasurer. They are not departments of the state, as are contemplated by the above section, but are mere subdivisions of the state. This is manifest when we consider the laws of the state relating to these various state contracts contemplated by section 107. Section 1 of the act here in question relates to those contracts covered by section 107 of the Constitution. The construction of that section is not here involved, and for that reason we do not feel called upon to consider its constitutionality in this case.

Kindred acts of other states have been held not violative either of their state or the federal Constitutions, in the cases of *Knight* v. *Barnes,* 7 N. D. 591, 75 N. W. 904, and *In re Gemmill,* 20 Idaho, 732, 119 Pac. 298, 41 L. R. A. (N. S.) 711, Ann. Cas. 1913A, 76. In the latter case there is quite an extended case note discussing the constitutionality of these various acts.

The able counsel for appellee severely criticize and arraign the wisdom of this act. They say it is but a shallow pretense to give a monopoly to resident printers and stationers of Mississippi. With the wisdom of the act this court has nothing to do. That is a matter entirely for the lawmaking body. It is solely our duty to say whether or not the act as passed by the legislature is violative of any of the provisions of the state or federal

Constitutions.  We find none of the provisions of either Constitution violated.

It is further contended that an information by *quo warranto* was not the proper remedy for the attorney-general to pursue.  The information alleges that the incorporators obtained this charter for fraudulent purposes; that the charter was fraudulently obtained; that all of the acts of the corporation and of its incorporators are violations of the law of the state.  We find in the brief of appellee a quotation from the case of *State ex rel. Clapp* v. *Minnesota Thresher Mfg. Co.*, 40 Minn. 213, 41 N. W. 1020, 3 L. R. A. 510:

"But we think it may be safely stated as the general concensus of the authorities that, to constitute a misuser of the corporate franchise such as to warrant its forfeiture, the *ultra vires* acts must be so substantial and continued as to amount to a clear violation of the condition upon which the franchise was granted, and so derange or destroy the business of the corporation that it no longer fulfills the end for which it was created.  But in case of excess of powers it is only where some public mischief is done or threatened that the state, by the attorney-general, should interfere."

The information in this case not only alleges that a fraud was practiced upon the state in obtaining the charter, but that the acts of this alleged corporation under this charter are all violations of the law.  Under the facts alleged in the information, and under section 4017 of the Code of 1906, *quo warranto* was eminently the correct procedure.  The demurrer, of course, admits all the allegations contained in the information, and it is our duty to assume, in reviewing this case, that these allegations are true as stated.  The information should have been answered.

The judgment of the lower court is reversed, and the cause remanded, with leave to the appellee to answer within thirty days after the mandate of this court is filed in the lower court.

                                *Reversed and remanded.*