[No. 47681-1. En Banc. November 24, 1982.]

LABORERS LOCAL UNION NO. 374, ET AL, *Appellants,* v. FELTON CONSTRUCTION COMPANY, ET AL, *Respondents.*

*Hafer, Cassidy & Price,* by *Richard H. Robblee,* for appellants.

*Perkins, Coie, Stone, Olsen & Williams,* by *Russell L. Perisho,* for respondent Felton Construction Co.

*David Foscue, Corporation Counsel,* for respondent City of Aberdeen.

*Kenneth O. Eikenberry, Attorney General, Thomas F. Carr, Senior Assistant,* and *Robert C. Hargreaves, Assistant,* amici curiae for appellants.

UTTER, J.—The trial court declared RCW 39.16 violated U.S. Const. art. 4, § 2, the privileges and immunities clause. The matter is on direct review to this court. We affirm.

RCW 39.16.005 provides in pertinent part:

> In all contracts let by the state . . . or any county, city . . . for the erection, construction, alteration, demolition, or repair of any public building . . . or any other kind of public work or improvement, the contractor or subcontractor shall employ ninety–five percent or more bona fide Washington residents as employees where more than forty persons are employed, and ninety percent or more bona fide Washington residents as employees where forty or less persons are employed . . .

Failure to comply with these provisions results in a criminal sanction. RCW 39.16.040.

In the spring of 1980, the City of Aberdeen awarded a sanitary sewer project to the lowest bidder, the Felton Construction Company, a Montana corporation. The project was funded by 25 percent state and local monies and 75 percent federal monies. After work commenced, appellants, Laborers Local Union 374 and two of its unem-

ployed members, sued Felton and the City for a writ of mandamus and for injunctive relief. They alleged Felton had not employed the statutorily required percentage of Washington residents on the sewer project.

Both Felton and the City denied appellants' allegations. The City admitted the sewer project was a public work. Felton did not. Felton moved to dismiss the complaint for failure to state a claim. The City moved for a declaratory judgment on the constitutionality of RCW 39.16.005. Appellants filed a cross motion for an order adjudging the statute to be constitutional.

After hearing arguments on the motions, the trial court declined to dismiss the action for failure to state a claim, but ruled that RCW 39.16.005 "is void because it violates the Privileges and Immunities Clause of the United States Constitution." We accepted review.

I

The privileges and immunities clause of U.S. Const. art. 4, § 2 states:

The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

■ The purpose of the privileges and immunities clause is "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L. Ed. 357 (1869). The history of the clause reflects a concern by the framers for keeping the newly independent states from adopting highly protectionist economic policies. The Articles of Confederation provide, "The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this union, the free inhabitants of each of these states . . . shall be entitled to all privileges and immunities of free citizens in the several states . . ." 9 *Journals of the Continental Congress 1774–1789*, at 908 (C. Ford ed. 1907).

The concerns expressed in the Articles of Confederation

did not dissipate with the demise of the Articles, but were reiterated with equal (if briefer) force in the comity article of the constitution. The privileges and immunities clause "implicates not only the individual's right to nondiscriminatory treatment but also, perhaps more so, the structural balance essential to the concept of federalism." *Austin v. New Hampshire,* 420 U.S. 656, 662, 43 L. Ed. 2d 530, 95 S. Ct. 1191 (1975).

## II

■ With these purposes in mind, the United States Supreme Court fashioned a test for determining if state legislation violates the privileges and immunities clause. The threshold inquiry is whether the interest subject to state legislation is a privilege or immunity within the meaning of the clause. In *Baldwin v. Fish & Game Comm'n,* 436 U.S. 371, 383, 56 L. Ed. 2d 354, 98 S. Ct. 1852 (1978), the Court stated:

> Only with respect to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally.

The *Baldwin* Court referred to such interests as "fundamental".

Once within the ambit of the clause, a state must demonstrate a "valid independent" reason for discriminating against nonresidents by showing:

(1) "'something to indicate that non–citizens constitute a peculiar source of the evil at which the [discriminatory] statute is aimed'". *Hicklin v. Orbeck,* 437 U.S. 518, 526, 57 L. Ed. 2d 397, 98 S. Ct. 2482 (1978), quoting from *Toomer v. Witsell,* 334 U.S. 385, 398, 92 L. Ed. 1460, 68 S. Ct. 1156 (1948); and

(2) "there must be a 'reasonable relationship between the danger represented by non–citizens, as a class, and the . . . discrimination practiced upon them.'" *Hicklin,* at 526, quoting from *Toomer,* at 399. The *Hicklin* Court also stated the discrimination must "bear a substantial

relationship", *Hicklin,* at 527, and must be "closely tailored", *Hicklin,* at 528, to the particular evil nonresidents present.

We will refer to this 2-part test as the *Toomer/Hicklin* test.

### A

Addressing *Baldwin*'s threshold question, we must first clarify the meaning of the term "fundamental". By using the term the *Baldwin* Court revived the somewhat anachronistic discussion of the privileges and immunities clause by Justice Washington in *Corfield v. Coryell,* 6 F. Cas. 546 (C.C.E.D. Pa. 1823) (No. 3,230). In its use of the term, the Court did not mean to embrace the analytical structure for identifying fundamental rights requiring strict scrutiny under the equal protection clause. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973). To the extent the term "fundamental" is helpful, it points to those interests "basic to the maintenance or well-being of the Union." *Baldwin,* at 388.

■ From the very beginning, "the right to ply one's trade in any State in the Nation was at the heart of the clause's guarantees." *Salla v. County of Monroe,* 48 N.Y.2d 514, 522, 399 N.E.2d 909, 423 N.Y.S.2d 878 (1979), *cert. denied sub nom. Abrams v. Salla,* 446 U.S. 909, 64 L. Ed. 2d 262, 100 S. Ct. 1836 (1980). *See Ward v. Maryland,* 79 U.S. (12 Wall.) 418, 20 L. Ed. 449 (1871).

[I]t was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of *substantial equality with the citizens of that State.*

(Italics ours.) *Toomer v. Witsell, supra* at 396, citing *Ward v. Maryland, supra. See Hicklin, supra. Baldwin* itself affirmed this principle in stating the "right to pursue a livelihood in a State other than his own [is] a right that is protected by the Privileges and Immunities Clause." *Baldwin,* at 386, citing *Toomer v. Witsell, supra; see also Northwest Gillnetters Ass'n v. Sandison,* 95 Wn.2d 638, 647–48, 628 P.2d 800 (1981) (sport fishing is not a privilege

or immunity, but commercial fishing is protected).

Appellants claim RCW 39.16 does not regulate a fundamental interest, but their arguments in this regard are misplaced. They argue first that inasmuch as RCW 39.16.005 applies only to contractors and subcontractors engaged in public works, such livelihood interests are not fundamental. The capacity to pursue work is fundamental whether in a public or private context. Appellants also argue that since RCW 39.16.005 sweeps much less broadly than the Alaska statute at issue in *Hicklin,* the interest affected is not fundamental. This point may be relevant to evaluating the statute under the *Toomer/Hicklin* test, but it does not make the interest any less fundamental. The State, in its amicus brief, concedes that RCW 39.16 operates to discriminate against nonresident workers in a limited context of public works construction. The *Toomer/Hicklin* test must therefore be applied.

## B

The State suggests the purpose of RCW 39.16.005 is to strengthen the economic welfare of state and local economies. We must first question the validity of such a legislative motive for purposes of privileges and immunities analysis. In *Hicklin,* at page 526, the Court questioned as "at least dubious" the validity of the Alaska Hire Statute's purpose of alleviating state unemployment. Here, the State has suggested no "evil" that nonresidents present. It has only suggested that by keeping within the state wages from public works projects, local economies will be strengthened. This is an example of the highly protectionist economic policies the privileges and immunities clause was designed to protect against. The State argues that since state tax dollars are being used on public works projects, the economic purposes of the statute "reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State." *Reeves, Inc. v. Stake,* 447 U.S. 429, 442, 65 L. Ed. 2d 244, 100 S. Ct. 2271 (1980). The State thus seeks to justify the statute's purpose based on

its proprietary role with respect to public works projects. While the State's proprietary role would not exempt it from privileges and immunities scrutiny (see discussion *infra* at 129–30), it might justify an otherwise illegitimate legislative purpose of seeking to foster state economic welfare. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 49 L. Ed. 2d 220, 96 S. Ct. 2488 (1976). We assume arguendo the legitimacy of the purpose of RCW 39.16.005 for purposes of analyzing the statute under the *Toomer/Hicklin* test.[1]

## C

■ Looking to the first part of the *Toomer/Hicklin* test, the "peculiar evil" that nonresidents represent is indicated by the State only by implication. By producing secondary economic activity and maximizing the return of tax dollars to the State, RCW 39.16.005's restrictions on contracting for public works benefit the state's economy. Eliminating the statute, we should assume, would undermine the secondary economic activity and reduce maximal use of state tax dollars by diverting wages out of the state.

Neither appellants nor the State provides *any* evidence that hiring out–of–state workers would constitute a peculiar evil by diverting wages out of the state. No proof is presented regarding the extent to which out–of–state contractors or subcontractors would bring their employees to the jobsite rather than hire locally (which is not an unfamiliar practice with respect to nonsupervisorial employees). Nor do appellants provide any evidence regarding the extent to which wages would be diverted out of state. Undoubtedly, out–of–state contractors purchase supplies and equipment in the state and some wages are spent here. In addition, some secondary economic activity is generated only by having out–of–state workers with their additional requirements of food and shelter. Finally, even if we were to assume some

---

[1]Notwithstanding this assumption, to the extent our discussion reveals the State's proprietary interest argument does not satisfy the requirements of the *Toomer/Hicklin* test, we will also be forced to reject the purpose of the statute as invalid.

wages would be diverted out of state, we have been provided no information by which to compare how that "loss" would compare with the advantage of lower bids on public works by out–of–state contractors.

In essence, we are presented with a bare allegation that the state benefits from RCW 39.16 and that nonresidents are the peculiar evil that would eliminate that benefit. The State seems to acknowledge its paucity of evidence in stating if the statute were struck down, nonresidents "might otherwise drain the economy." Brief of Amicus Curiae, at 12. Neither appellants nor the State has shown "something to indicate that non–citizens constitute a peculiar source of the evil at which the statute is aimed." *Toomer,* at 398. RCW 39.16.005's discrimination against nonresidents is not justified by any "substantial reason . . . beyond the mere fact that they are citizens of other States." *Toomer,* at 396.

## D

Absent an identified "peculiar evil", it is difficult to determine if the statute is closely related to eliminating the alleged evil nonresidents present. Needless to say, if the evil is not identified, legislation can hardly be closely related to eliminating it. We have no way of ascertaining if the statute is closely tailored to serving the purpose of benefiting the state economy. We have not been told the magnitude of the economic gain to the state the statute provides by its employment restrictions or the loss it occasions by discouraging competitive bids.

Neither appellants nor amicus has demonstrated that nonresidents are a peculiar evil, nor has either shown how the statute is "closely tailored" to achieving a legitimate state purpose.

## E

■■ Appellants and amicus nevertheless argue that since the legislation involves the State in its proprietary capacity, it may with justification discriminate against nonresidents. Addressing a similar proprietary interest argument in *Hicklin,* the Court refused to establish an

exception under the privileges and immunities clause, stating:

> Rather than placing a statute completely beyond the Clause, a State's ownership of the property with which the statute is concerned is a factor—although often the crucial factor—to be considered in evaluating whether the statute's discrimination against noncitizens violates the Clause. Dispositive though this factor may be in many cases in which a State discriminates against non-residents, it is not dispositive here.

437 U.S. at 529. The *Hicklin* Court concluded Alaska had "little or no proprietary interest in much of the activity swept within the ambit" of the statute. *Hicklin,* at 529.

As a public work involving state tax dollars, the Aberdeen sewer project is one to which the State may claim some proprietary interest. No one questions that the sewer project will enure to the benefit of the City of Aberdeen or that if the City had desired to, it could have built the system itself. The statute is not limited to the ownership rights of the State, however. It specifically places limitations on private contractors and their subcontractors. While the economic impact of RCW 39.16 on the private sector is not as far ranging as the Alaska Hire Statute, it nevertheless affects private employers who have no direct dealings with the State. *See Hicklin,* at 532.

Furthermore, while the *Hicklin* Court did not dispute Alaska's ownership of its oil and gas, we have good reason to question the extent of the State's ownership here. State and local tax dollars were used for Aberdeen's sewer project, but 75 percent of the funding came from the federal government. This public works project is not solely a state endeavor, and its funding is an example of the principle embodied in the constitution that "the peoples of the several states must sink or swim together". *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523, 79 L. Ed. 1032, 55 S. Ct. 497, 101 A.L.R. 55 (1935) (Cardozo, J.).

The interdependent nature of the funding for public works projects makes this case distinguishable from the

commerce clause cases appellants cite in support of their proprietary interest argument. First, it must be remembered that while the commerce clause and privileges and immunities clause have a "mutually reinforcing relationship", *Hicklin,* at 531, the two clauses are not coextensive. Analogy to commerce clause cases here is simply that. The commerce clause focuses on undue burdens on interstate commerce. It is an affirmative grant of power to Congress and an implied restriction on the power of states. The privileges and immunities clause is a direct limitation on states and explicitly secures privileges and immunities for individuals who move from state A to state B. *Toomer,* at 395.

In *Reeves, Inc. v. Stake, supra,* South Dakota had by itself initiated cement production, and the Court felt it was entitled to benefit from its "foresight, risk, and industry". 447 U.S. at 446. In *Hughes v. Alexandria Scrap Corp., supra,* Maryland used only its own funds for bounties on junk cars to clean up the state's landscape and protect the state's environment. *Cf. Baldwin v. Fish & Game Comm'n, supra* (where the Court's reason for upholding a game–licensing statute reflected its appreciation of Montana's protection of its environment).

Even under the commerce clause, the United States Supreme Court has declined to permit states to pursue "simple economic protectionism" where the State's ownership of the resource protected is attenuated. *See New England Power Co. v. New Hampshire,* 455 U.S. 331, 71 L. Ed. 2d 188, 102 S. Ct. 1096 (1982).

Also, appellants' citation to *Equitable Shipyards, Inc. v. State,* 93 Wn.2d 465, 611 P.2d 396 (1980) in support of its proprietary interest argument is inappropriate. *Equitable Shipyards,* a case upholding a statutory preference for in–state shipbuilders, concerned the equal protection clause. Since residency is not a suspect category, the statute in *Equitable Shipyards* was subject only to a minimum rationality test. By contrast, the *Toomer/Hicklin* test establishes a standard at least comparable to the interme-

diate level of scrutiny, *Massachusetts Coun. of Constr. Employers, Inc. v. Mayor of Boston*, 425 N.E.2d 346, 352 n.7 (Mass. 1981) (U.S. appeal pending), and possibly consonant with the strict level of scrutiny under equal protection analysis. *See* L. Tribe, *American Constitutional Law* 411 (1978).

## F

The statute before us specifically restricts nonresidents in their pursuit of a livelihood and the State's ownership interest here does not obviate the need for scrutiny under the privileges and immunities clause.

As the Court in *Toomer* stated:

> The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States.

(Footnote omitted.) 334 U.S. at 402.

The State's proprietary interest, represented by its tax dollars, is too attenuated to justify RCW 39.16.005's discrimination against nonresidents. Our conclusion is entirely consistent with a trio of decisions by other state courts which have struck down remarkably similar statutes under the privileges and immunities clause. *Neshaminy Constructors, Inc. v. Krause*, 181 N.J. Super. 376, 437 A.2d 733 (1981); *Massachusetts Coun. of Constr. Employees, Inc. v. Mayor of Boston, supra; Salla v. County of Monroe*, 48 N.Y.2d 514, 399 N.E.2d 909, 423 N.Y.S.2d 878 (1979), *cert. denied sub nom. Abrams v. Salla*, 446 U.S. 909, 64 L. Ed. 2d 262, 100 S. Ct. 1836 (1980). We do not hold that the State is proscribed from distributing resources it creates to its own citizens, but such a case is not before us. The State's proprietary interest is insubstantial and RCW 39.16.005's discrimination against nonresidents violates the

provisions of the privileges and immunities clause.

BRACHTENBACH, C.J., and STAFFORD, DOLLIVER, and WILLIAMS, JJ., concur.

DORE, J. (dissenting)—I would have held that RCW 39.16 was constitutional and not in violation of the privileges and immunities clause of the United States Constitution because RCW 39.16 does not apply to projects supported by public money but only to those organized by private persons and organizations, or by private employers who bid for state purchase contracts.

I

States may discriminate constitutionally on the basis of residency when acting in a sovereign or proprietary capacity.

The Washington statute applies only to those with whom the state or local government contracts to build a public work. By definition, money raised from residents finances the project. The State is, therefore, acting in a proprietary capacity when discriminating against nonresidents under RCW 39.16.

The mutually reinforcing relationship between the privileges and immunities clause and the commerce clause stems from their common origin in the fourth article of the Articles of Confederation and their shared vision of federalism. *Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 379, 56 L. Ed. 2d 354, 98 S. Ct. 1852 (1978). This unique relationship renders analogy to recent commerce clause proprietary cases particularly appropriate.

The United States Supreme Court recently found permissible under the commerce clause a state policy which limited the sale of a state–owned resource to state residents. *Reeves, Inc. v. Stake*, 447 U.S. 429, 65 L. Ed. 2d 244, 100 S. Ct. 2271 (1980). At stake in *Reeves* was the distribution policy of a cement plant owned and operated by the State of South Dakota. During a period of cement shortage, the State refused to supply cement to out–of–state custo-

mers. A Wyoming customer alleged that South Dakota's residents–only policy violated the commerce clause. Placing its support of the residents–only policy squarely on the rights of South Dakota when acting as a proprietor, the Supreme Court found no constitutional deficiency. Following the earlier case of *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 49 L. Ed. 2d 220, 96 S. Ct. 2488 (1976), the Court found that the commerce clause did not restrict a state when acting as a proprietor from favoring its own citizens over others. As a "general rule", states, when acting as market participants or as proprietors, were not engaged in "the kind of action with which the Commerce Clause is concerned". *Hughes*, at 805.

*Reeves* was grounded on three identifiable principles. First, states in their proprietary capacity should be free to set the terms of their own contracts. "[W]hen acting as proprietors, States should similarly [to private market participants] share existing freedoms from federal constraints, *including the inherent limits of the Commerce Clause."* (Italics mine.) *Reeves,* at 439. *See also Reeves,* at 438 n.10 ("States may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal").

Second, the favoring of residents comports with the very purpose of a state. The Wyoming customer had argued that the residents–only policy was "protectionist" and not an appropriate government objective. The Court disagreed, emphasizing the right of a state to limit state benefits to those it serves and by which it is funded.

Third, the Court was influenced by "considerations of state sovereignty" and its related role as ""'"guardian and trustee for its people". *Reeves,* at 438. Earlier authority held that Congress could not interfere with certain employment relations with state workers affecting integral state operations "in areas of traditional governmental functions". *Reeves,* at 438 n.10, quoting *National League of Cities v. Usery,* 426 U.S. 833, 852, 49 L. Ed. 2d 245, 96 S. Ct. 2465 (1976) (Congress under the commerce clause could not

apply Fair Labor Standards Act to state governments).

Even when public welfare laws were regularly stricken, the Supreme Court allowed states to place beneficial labor conditions on public works contracts. *Atkin v. Kansas,* 191 U.S. 207, 48 L. Ed. 148, 24 S. Ct. 124 (1903). The *Atkin* Court could not imagine a possible ground limiting the right of a state to set 8–hour workdays on public works projects. The Court concluded this right "belongs to the State, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities". *Atkin,* at 222–23. *See also Equitable Shipyards, Inc. v. State,* 93 Wn.2d 465, 611 P.2d 396 (1980), quoting *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 84 L. Ed. 1108, 60 S. Ct. 869 (1940). Under the same theory, states may require state printing to be done by in–state companies. *American Yearbook Co. v. Askew,* 339 F. Supp. 719, 721–22 (M.D. Fla.), *aff'd,* 409 U.S. 904, 34 L. Ed. 2d 168, 93 S. Ct. 230 (1972).

In 1980, this court upheld the constitutionality of a statute granting a bidding preference to in–state companies for ferry construction contracts. *Equitable Shipyards, Inc. v. State, supra.* The statute was challenged only under the equal protection clause. However, the court found that the purpose of the state preference passed "constitutional muster" in part because "construction of ferries within the state strengthens state and local economies". *Equitable,* at 479. We stated at pages 476–78:

> We have held the federal equal protection clause and the state privileges and immunities clause (Const. art. 1, § 12) are substantially identical. *Olsen v. Delmore,* 48 Wn.2d 545, 295 P.2d 324 (1956). While the State objects to considering the equal protection claim as not raised by Equitable in the trial court, we believe the issue should be addressed.
>
> In other contexts, the United States Supreme Court has stated that government, like private individuals and businesses, "enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal,

and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 84 L. Ed. 1108, 60 S. Ct. 869 (1940). *See also Heim v. McCall,* 239 U.S. 175, 191, 60 L. Ed. 206, 36 S. Ct. 78 (1915).

The State asserts that equal protection guaranties are not applicable when the state acts in its proprietary capacity as a purchaser of goods. Relying on *Heim,* other state courts have upheld statutory in–state purchasing preferences against both equal protection and commerce clause challenges. *See, e.g., City and County of Denver v. Bossie,* 83 Colo. 329, 266 P. 214 (1928) ("the state may buy of whom it will"); *State ex rel. Collins v. Senatobia Blank Book & Stationery Co.,* 115 Miss. 254, 76 So. 258 (1917) (rejecting equal protection challenge to a statute prohibiting state contracting with nonresident bidders).

. . .

In this case, we need not go so far as to hold that because a contract is public and requires expenditure of public funds the legislature may, without reasonable basis, grant a preference. Here, as later discussed, a reasonable basis exists for the preference sufficient to withstand constitutional attack.

. . .

We conclude the preference statute is most closely allied with economic legislation requiring only rational basis scrutiny.

From reading *Equitable* it is clear that, without the 6 percent preference, the contract undoubtedly would have been awarded to Equitable. However, by its decision, the court, in effect, held that it was a legitimate state purpose to favor in–state corporations and contractors.

All three principles relied upon by *Reeves* and other courts recognize the unique constitutional status of states when they distribute state benefits rather than regular private activity. Each principle respects states, as members of a federal form of government, where states practice primary state purposes. The Washington statute is justified by these doctrines.

The privileges and immunities clause guarantees to nonresidents those rights of residents which properly belong to

everyone. As *Baldwin* summarized, rights uniquely linked to residency such as suffrage, candidacy, and access to state services are not rights to which the privileges and immunities clause is directed. Distinctions favoring residents in these cases "merely reflect the fact that this is a Nation composed of individual States, and are permitted". *Baldwin,* at 383.

## II

The majority's reliance upon the rationale and precedent of *Hicklin v. Orbeck,* 437 U.S. 518, 57 L. Ed. 2d 397, 98 S. Ct. 2482 (1978) is misplaced. The "Alaska Hire" law in *Hicklin* created an employment preference favoring Alaska residents for "all employment which is a result of oil and gas leases" and other legal arrangements to which the State of Alaska was lessor. Alaska Stat. Ann. § 38.40.050(a) (1977). The Supreme Court emphasized the broad reach of the Alaska law in *Hicklin,* at pages 530–31:

> Under this provision, Alaska Hire extends to employers who have no connection whatsoever with the State's oil and gas, perform no work on state land, have no contractual relationship with the State, and receive no payment from the State. The Act goes so far as to reach suppliers who provide goods or services to subcontractors who, in turn, perform work for contractors despite the fact that none of these employers may themselves have direct dealings with the State's oil and gas or ever set foot on state land. . . . In sum, the Act is an attempt to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents.

(Footnote omitted.) In *Hicklin,* the Court stated the purpose of the statute at pages 526–28:

> Alaska Hire was enacted to remedy, namely, Alaska's "uniquely high unemployment." Alaska Stat. Ann. § 38.40.020 (1977). What evidence the record does contain indicates that the major cause of Alaska's high unemployment was not the influx of nonresidents seeking employment, but rather the fact that a substantial number of Alaska's jobless residents—especially the unem-

ployed Eskimo and Indian residents—were unable to secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities; and that the employment of nonresidents threatened to deny jobs to Alaska residents only to the extent that jobs for which untrained residents were being prepared might be filled by nonresidents before the residents' training was completed.

. . . Alaska Hire simply grants all Alaskans, regardless of their employment status, education, or training, a flat employment preference for all jobs covered by the Act. A highly skilled and educated resident who has never been unemployed is entitled to precisely the same preferential treatment as the unskilled, habitually unemployed Arctic Eskimo enrolled in a job–training program. If Alaska is to attempt to ease its unemployment problem by forcing employers within the State to discriminate against nonresidents—again, a policy which may present serious constitutional questions—the means by which it does so must be more closely tailored to aid the unemployed the Act is intended to benefit. Even if a statute granting an employment preference to unemployed residents or to residents enrolled in job–training programs might be permissible, Alaska Hire's across–the–board grant of a job preference to all Alaskan residents clearly is not.

(Footnote omitted.) *Hicklin* concluded at pages 533–34:

Although the fact that a state–owned resource is destined for interstate commerce does not, of itself, disable the State from preferring its own citizens in the utilization of that resource, it does inform analysis under the Privileges and Immunities Clause as to the permissibility of the discrimination the State visits upon nonresidents based on its ownership of the resource. Here, the oil and gas upon which Alaska hinges its discrimination against nonresidents are of profound national importance. On the other hand, the breadth of the discrimination mandated by Alaska Hire goes far beyond the degree of resident bias Alaska's ownership of the oil and gas can justifiably support. The confluence of these realities points to but one conclusion: Alaska Hire cannot withstand constitutional scrutiny.

(Footnote omitted.)

The Washington statute has no such reach. Unlike

Alaska Hire, (1) it is limited to projects to which state or local governments are direct contracting parties; (2) it applies only to those private employers who themselves contract with government and those employees who work directly on public jobs; and (3) the Washington statute regulates only those who receive direct economic benefit from public–funded government projects.

## CONCLUSION

RCW 39.16 assures that state residents enjoy the benefits of state spending. The limiting of benefits to those who fund the state treasury and for whom the State was created to serve affects the essential and patently unobjectionable purpose of state government—to serve the citizens of the state.

Moreover, the State should be deemed free to deal with its own residents when it builds public works. It is the "owner" of the job creating the employment. If it built the sewer system itself, the City of Aberdeen would not violate any "right to travel" by requiring its employees to be residents. Since that right is accepted, the City should be permitted to put the same condition on work it contracts out.

The statute does not interfere with a nonresident's right to ply his or her trade within Washington state. General restrictions on private employment unconnected with state funds or projects are invalid. *Ward v. Maryland,* 79 U.S. (12 Wall.) 418, 20 L. Ed. 449 (1871). RCW 39.16 has no effect on the private labor market since it applies to work created by public agencies. As noted, unlike the Alaska Hire statute in *Hicklin* it does not expend public money to seek to control private employment. Nonresidents are precluded only from public works.

The Washington statute is confined to the reach justified by its interest as sovereign and owner of the project. *Hicklin* extensively distinguished Alaska Hire from such a narrow law. As later explained in *Reeves,* the public works employment statute affects interests which the privileges and immunities clause reserves to state control. Had Equi-

table Shipyards known that this court would declare RCW 39.16 unconstitutional, it could have arranged to go into right–to–work states and secure personnel to construct the job, underbidding the local company or contractor who is required to hire union employees. In the future, local contractors and subcontractors bidding on public works will be at an extreme disadvantage when competing with out–of–state corporations which can base their bids on nonunion labor and substantially undercut the bids of Washington contractors. At last report, Grays Harbor had an unemployment rate in excess of 30 percent. Such communities, when they own the public works project themselves, should be able to require that the work be done by unemployed union workers who are residents of the community. Even worse, at a time when statewide unemployment has hit an all–time high of over 12 percent, the majority precludes the Legislature from enacting legislation establishing proprietary public works projects for unemployed residents as a partial solution for our state's unemployment problem. Such a narrow interpretation of our constitution is not justified.

I would uphold the constitutionality of RCW 39.16, and reverse the judgment of the trial court.

ROSELLINI, DIMMICK, and PEARSON, JJ., concur with DORE, J.